**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**ATLANTA DIVISION**

| | |
|---|---|
| Addam Orsburn,<br><br>Plaintiff,<br><br>v.<br><br>Tandem Defense LLC, Jeremy Schnipke, and Andrew Valkenburg,<br><br>Defendants. | CIVIL ACTION<br>No.:<br><br>JURY TRIAL DEMANDED |

# COMPLAINT

## I. INTRODUCTION

1. This case is about friendly fire. Three military friends founded a company, Strategic Logix, LLC, to fix what they saw as problems in the procurement process.

2. One of those founders, Plaintiff Addam Orsburn, was called back for deployment just as the company experienced rapid growth.

3. Two of the other founders, Defendants Andrew Valkenburg and Jeremy Schnipke, held it against him. As the end of his deployment approached, Schnipke and Valkenburg attempted to separate Orsburn from his equity for dramatically less than it was worth and refused to allow him to return to the company.

4. When those efforts failed, Valkenburg and Schnipke stripped Strategic Logix for parts by transferring its intellectual property, project pipeline, customer

information, supplier information, and procurement selections, then cloned the company in a new limited liability company, Defendant Tandem Defense LLC.

5. Orsburn cannot have his deployment held against him, nor can Defendants refuse to reinstate him to the role he held prior to his deployment.

6. Orsburn therefore brings this action to vindicate his rights under the Uniformed Services Employment and Re-employment Rights Act of 1994 ("USERRA").

## II. JURISDICTION AND PARTIES

### *A. Subject Matter Jurisdiction*

7. The Court has original subject matter jurisdiction over Orsburn's USERRA claims under 28 U.S.C. § 1331.

8. The Court has supplemental jurisdiction over all claims for which it lacks original subject matter jurisdiction pursuant to 28 U.S.C. § 1367 because these claims arise out of the same common nucleus of operative facts as the claims over which the Court has original subject matter jurisdiction.[1]

### *B. Personal Jurisdiction*

9. This Court has general personal jurisdiction over Tandem Defense LLC because it is a Georgia limited liability company and, upon information and belief, one or more of its members is a citizen of the State of Georgia.

[1] Orsburn anticipates amending this Complaint to assert additional common-law claims.

10. This Court has general personal jurisdiction over Schnipke and Andrew Valkenburg because they are citizens of the State of Georgia.

11. Alternatively, the Court has specific personal jurisdiction over all Defendants because the acts or omissions underlying Orsburn's claims substantially occurred in the State of Georgia.

### *C. Venue*

12. This Court is a proper venue for Orsburn's claims under 28 U.S.C. § 1391(b) and (c), as a substantial part of the events giving rise to Orsburn's claims occurred in this District and a defendant is subject to the Court's personal jurisdiction in this District.

13. This Court is also a proper venue because Tandem Defense is a private employer and it maintains a place of business in this District at 6600 Peachtree Dunwoody Road, Bldg. 600, Suite 255, Atlanta, GA, 30328.

14. Divisional venue is proper in the Atlanta Division because Defendant Jeremy Schnipke is a resident of Gwinnett County.

### *D. The Parties*

15. Plaintiff Addam Orsburn is a citizen and resident of Oklahoma.

16. Defendant Tandem Defense LLC is a Georgia limited liability company with its principal place of business located at 6600 Peachtree Dunwoody Road, Bldg.

600, Suite 255, Atlanta, GA, 30328. Tandem Defense may be served through its registered agent, SK Legal Group, LLC, at the same address as its principal office.

17. Defendant Jeremy Schnipke is a citizen and resident of Georgia, and he may be served at his residence located at 6175 Trail Hikes Drive, Sugar Hill, GA 30518.

18. Defendant Andrew Valkenburg is a citizen and resident of Georgia, and he may be served at his residence located at 28 Spartina Lane, Richmond Hill, GA 31324.

## III. FACTUAL ALLEGATIONS

### *A. Strategic Logix's Formation*

19. Addam Orsburn, Jeremy Schnipke, and Andrew Valkenburg met each other through their shared service in the military.

20. Valkenburg worked as an S4 procurement officer, a role that gave him deep insight into the military's convoluted procurement process. He observed the disconnect that occurred between what ground-level troops needed and the procurement process set from on high. So he had the idea to start a company that would provide ground-floor procurement and modernization support to the military. He named the company Strategic Logix.

21. When he started the company in September 2024, Valkenburg remained an active member of the armed forces, so he began with his home brigade

as a testing ground. Strategic Logix began by fulfilling procurement needs for Valkenburg's brigade before spreading to other units at the same military installation.

22. From the beginning, Valkenburg orchestrated the company's operations. He also set the initial structure; he, Schnipke, Orsburn, and Valkenburg's brother, Neil Valkenburg, each held some equity in the company.

23. Orsburn's initial role and duties focused on sales, where he assisted the company in generating potential procurement partners and obtaining new contracts for the company.

24. At first, Orsburn received a 5% membership interest in Strategic Logix, as well as a percentage of the revenue for contracts he landed for the company.

25. Due to Orsburn's early success in his role, Valkenburg removed the commission component of Orsburn's compensation, increased his membership interest from 5% to 20%, and gave him the title of Director of Business Development.

26. Valkenburg still had concerns about officially acknowledging his membership interest while still on active duty status, so he and Schnipke settled on a temporary ruse. In two separate conversations, Valkenburg and Schnipke told Orsburn that, while Valkenburg expected to leave active service soon due to a

medical retirement, they would provide a different membership allocation on paper until January 1, 2025, his anticipated separation date.

27. Until then, the allocation on paper would be as follows:

- Schnipke would on paper own a 75% interest in Strategic Logix, and Neil Valkenburg, Andrew Valkenburg's brother, would hold a 5% interest.
- When Andrew Valkenburg finished his service, Schnipke and Andrew Valkenburg would equally split the 75% interest held by Schnipke so each held 37.5% or 40% of the company.[2]
- Orsburn would hold the remaining 20%.
- Andrew Valkenburg would continue to actively work for the company during his remaining service and conceal his dual role.

28. Valkenburg remained fully involved in Strategic Logix, where he played a major role in operational decisions, business development, contract development, and administration.

29. Valkenburg also continued to direct Orsburn's work on a day-to-day basis.

30. In November 2024, Schnipke prepared an initial operating agreement for Strategic Logix. The operating agreement set the membership allocation as follows: (1) Schnipke with 75%; (2) Neil Valkenburg at 5%; and (3) Orsburn at 20%.

[2] In some communications, Neil Valkenburg retained a 5% interest. In others, Andrew Valkenburg listed only himself, Schnipke, and Orsburn as members.

31. The draft operating agreement also provided that "***All Members, including Addam Orsburn***, will be employed by the LLC and will receive a fixed salary in addition to their ownership distributions."

32. The draft operating agreement further provided that Schnipke would act as the CEO and Managing Member, with "final authority" for decisions.

33. As 2024 drew to a close, Strategic Logix continued to experience significant growth. By the end of the year, Valkenburg told Orsburn and Schnipke that the "worst case scenario" was that the company was worth $20mm, and the valuation ceiling could be as high as $47mm. Valkenburg then provided breakdowns for a sale at those values where he identified himself as a member.

*B. Orsburn Receives Orders for Federal Service*

34. In late 2024, Orsburn received final orders to report for federal service through the Oklahoma National Guard. Orsburn notified Valkenburg and Schnipke after he received orders and before his reporting date in 2024.

35. Orsburn's orders provided that his service began in January 2025, could last for as long as 400 days, though based on prior deployments, the end date could be as early as Thanksgiving of 2025.

36. During Orsburn's deployment, he remained involved in Strategic Logix's operations. He regularly discussed developments with Valkenburg and worked with him on business development and procurement opportunities.

*C. Strategic Logix Experiences Rapid Growth*

37. As Strategic Logix matured, the company found product-market fit in drone procurement.

38. One of Strategic Logix's offerings, the Rapid Reconfigurable Systems Line ("RRSL"), a modular platform for various drone use cases, garnered significant interest. Strategic Logix obtained Blue UAS certification for the platform, a certification confirming security and procurement standards set by the Department of Defense.

39. These successes harbored far bigger opportunities for the company. In the summer of 2025, Strategic Logix was invited to submit a proposal for the Army Purpose-Built Attritable System ("PBAS") program of record. If selected, the company would have a multi-year purchasing pipeline likely to exceed $100mm in revenue.

40. In June 2025, Valkenburg told Orsburn that one investor had expressed interest in buying 75% of Strategic Logix for $250mm, with each member receiving a salaried position and a pro rata reduction in their current interest.

41. In August 2025, Valkenburg set up benefits for the group through Insperity and began the process to begin paying salaries for each of the employees/members. When he communicated the benefits to Schnipke, Neil Valkenburg, and Orsburn, he recognized, "***For owners***, if ***we*** fund ***our*** benefits out

of pocket, it is post tax, as that is **a** rule for S Corps. So, the company will be funding ***our*** benefits."

42. Valkenburg's signature block still identified him as a Partner in Strategic Logix.

43. By early September 2025, the company's pipeline was bursting with orders. On September 9, 2025, Valkenburg provided a summary to Orsburn outlining the company's pending sales. The total exceeded $30mm, excluding any award from the PBAS program.

44. Then the PBAS selections arrived. Strategic Logix had been selected. The selection—beyond the immense revenue directly available under the program—also gave Strategic Logix the ability to market some of its drones as "program of record" selections, tantamount to the Army's seal of approval and an incredibly potent qualification to highlight in bids for other government contracts.

45. The incoming revenue was so significant that, by October 17, 2025, Strategic Logix placed a $12.8mm order for 160,000 drone components from Unusual Machines, its primary supplier. *Strategic Logix Logs $12.8M Purchase of over 160,000 Drone Components for 2026*, available at: https://strategic-logix.com/news/about/strategic-logix-logs-12-8m-purchase-of-over-160 (last accessed Mar. 26, 2026).

46. Around the same time that Strategic Logix received the PBAS selection, Valkenburg continued work on setting up payroll by listing his start date as September 11, 2024 and changing his status from "unpaid" to "contractor" effective September 28, 2025.

47. Valkenburg and Orsburn also discussed what Orsburn's salary would be. Orsburn asked for his salary to be set for $215,000, $5,000 more than he had ever made, and Valkenburg agreed.

*D. Valkenburg and Schnipke refuse to reinstate Orsburn and retaliate against him for taking protected leave*

48. On or about September 25, 2025, Orsburn received a message from Valkenburg to call him because he had received an offer to buy. During the call, Valkenburg told Orsburn that the sale offer was for something around $60 million to $70 million, plus receiving stock in the new company, and employment contracts. Valkenburg asked Orsburn if he was still fine with a salary of $215,000 a year, and Orsburn confirmed that he was.

49. In the same or roughly contemporaneous conversation, Valkenburg told Orsburn that Neil Valkenburg had "given back" his 5% interest because he did not feel like he did enough work for the company to warrant receiving that amount of money. Instead, Valkenburg said his brother requested, "Buy me a house when y'all get rich."

50. On information and belief, this was an attempt by Valkenburg and Schnipke to provide a predicate for them to demand that Orsburn likewise give up his equity.

51. Through late September to early October, Orsburn kept Valkenburg apprised on his upcoming return from his deployment. Valkenburg and Schnipke, on the other hand, began to act on their scheme to discriminate and retaliate against Orsburn. In early October, Valkenburg called Orsburn and said he needed to convey "bad news": Valkenburg and Schnipke did not feel that the current ownership structure was "equitable" given Orsburn's "absence" caused by his USERRA-protected service. Valkenburg told Orsburn that he was going to receive an offer to buy out his 20% interest in the company from Schnipke.

52. On Tuesday, October 10, 2025, Schnipke sent a proposal to Orsburn to eliminate his equity for nothing or next to nothing. He began by claiming that the "verbal agreements we made at the start" had not held up, that "Andrew [Valkenburg] and [Schnipke] have put in thousands of hours . . . to keep the company moving forward," and "the structure we started with no longer reflects how things stand today."

53. Schnipke continued that, while he understood "there were limited on what [Orsburn] could do while deployed, the reality is that the expected level of

contribution didn't materialize and we can't base ownership on the promise of future involvement that never came together."

54. He acknowledged that Orsburn's deployment created "limitations" but "the level of involvement hasn't been in line with what would make ***the current arrangement*** equitable." From that, Schnipke said that "we," referring to himself and Andrew Valkenburg, saw two options:

> 1. Buyout – we buy out your interest and you sign a release of equity.
>
> 2. Reset & earn-in – reduce equity to zero for now, with a moderate salary and the opportunity to earn equity options tied to future contributions and performance.

55. Orsburn responded that he felt like he was being punished for his deployment. He also relayed that he had turned down other opportunities "to honor my agreement to come back to the company."

56. Schnipke complained that he and Valkenburg "didn't anticipate that we would need to provide ongoing direction for [Orsburn] to engage." Schnipke then lectured Orsburn that "***Ownership*** carries an expectation of initiative, risk and accountability—that's the standard ***Andrew and I*** have held ourselves to ***since day one***."

57. Orsburn refused to give up or sell his equity for next to nothing.

58. On October 14, 2025, Orsburn called Valkenburg and had a 23-minute FaceTime meeting with him. During this meeting, Valkenburg told Orsburn that

what Schnipke was doing was wrong and he did not want this, but he would never go against Jeremy.

59. Orsburn told Valkenburg that they were making a huge mistake and that their efforts to hide the true ownership and employment with the company would come out in a dispute. He conceded, "Yeah, that's not ideal."

60. Valkenburg then asked Orsburn whether he cared about the company. He responded, "Of course I do. That's why I'm begging you guys to not do this." Valkenburg responded with something like, "This is wrong, this is not what I wanted. I'll fix this. I gotta go," then he hung up.

61. That was the last time Orsburn spoke to Valkenburg.

62. Orsburn retained an attorney, Jason Gordon, as counsel.

63. On October 20, 2025, Orsburn's counsel sent a notice and demand to the Valkenburgs and Schnipke to recognize Orsburn's interest in Strategic Logix.

64. He received a response from Grace Tillman, an attorney with Oberman Law, who identified herself as counsel for both Strategic Logix and Schnipke.

65. In their initial phone call, Tillman claimed that Orsburn did not have *any* ownership interest in Strategic Logix because every member was required to "earn" their membership interest.

66. Tillman added that, if Orsburn did not agree, then the members would simply "dissolve the company and start a new one."

67. The attempt at intimidation was so vacuous and unsupported that Tillman quickly abandoned it. Instead, she pivoted to veiled threats.

68. Tillman then offered that, while Orsburn was deployed, he "had time for extracurricular activities but he didn't have time to help run the company, and it would be unfortunate if people found out what he was doing instead."

69. This was a not-so-subtle threat that, unless Orsburn agreed to sell his interest for peanuts, Schnipke and/or Valkenburg would disclose personal, embarrassing information about Orsburn.

70. When that failed, Schnipke and Valkenburg embarked on a scheme to re-create Strategic Logix at another company—a continuation of its operations but without the need to reinstate Orsburn or fairly pay him for his membership interest.

*E. The Corporate Coup*

71. When those measures failed, the turncoats began stripping Strategic Logix for parts. On December 18, 2025, Gordon and Orsburn receive notice of a Company meeting. The meeting notice lists the following as membership interest percentages: (1) Schnipke at 75%; (2) Orsburn at 20%; and (3) Neil Valkenburg at 5%.

72. The agenda was a transparent attempt to begin siphoning off the company's operations away from Orsburn. The agenda items were:

- Approve Valkenburg's resignation from Strategic Logix, effective December 31, 2025.

- Consolidate decision-making authority for day-to-day operations in Schnipke.
- Grant Valkenburg a royalty-free, perpetual license to use all company intellectual property (while disclaiming that the company has IP) after leaving the Company.
- After freeing Valkenburg from his common-law duties as an employee, retain him as an independent contractor so he can retain access to Strategic Logix's operations and transfer them elsewhere, effectively causing Strategic Logix to pay for its executioner.

73. Valkenburg did not attend this meeting, but an attorney, Cary King, provided a letter claiming that Valkenburg was not a member and would not attend the meeting but, "to the extent Andrew Valkenburg is deemed a member", he waived his right to attend the meeting.

74. On January 20, 2026, another meeting was called to dissolve the company and wind down activity.

75. All indications that the members were making any effort to keep Strategic Logix viable as a going concern vanished:

- Employees stopped loading any deal into HubSpot, the customer relationship management platform.
- Sales personnel were given no direction or excluded from customer conversations.
- Logged orders or opportunities began to mysteriously disappear from HubSpot.
- Incoming deposits almost entirely stop, and the sales pipeline, which Valkenburg had valued at over $30mm before the PBAS award, is entirely absent from bank account records.
- Valkenburg downloaded the company's *full customer list* from HubSpot in November.

76. On their way out the door, Valkenburg and Schnipke awarded themselves retroactive pay and bonuses but did not make any similar retroactive compensation for Orsburn.

*F. Valkenburg and Schnipke Have Their Cover Blown*

77. On or around March 9, 2026, a publicly traded shell company called Aureus Greenway Holdings Inc. (AGH) announced that it had entered into a definitive merger agreement with a company called Powerus Inc. *See New American Drone and Defense Company to be Created Through Merger of Powerus and Aureus Greenway Holdings*, available at: https://www.nasdaq.com/press-release/new-american-drone-and-defense-company-be-created-through-merger-powerus-and-aureus (last accessed Mar. 26, 2026).

78. The press release also disclosed that one of Powerus's "wholly owned subsidiaries" is a company called Tandem Defense LLC. (*Id.*)

79. Tandem's organizer and CEO is Andrew Valkenburg.

80. The Georgia Secretary of State reveals that the name "Tandem Defense" was reserved on November 25, 2025, effective December 2, 2025, and Andrew Valkenburg organized the company effective December 18, 2025.

81. Tandem Defense makes almost no effort to hide that it is a clone of Strategic Logix minus Orsburn's interest.

82. Tandem's business operations are fundamentally the same and, upon information and belief, its customers, suppliers, and contracts were entirely transferred from Strategic Logix by Valkenburg and Schnipke.

83. Upon information and belief, Tandem uses the same or similar facilities. It, like Strategic Logix, largely relies on Unusual Machines, a major supplier, for drone parts and uses the same production methods to complete orders.

84. Tandem's work force is largely the same and supervised by Valkenburg and Schnipke.

85. And Tandem's products and services are nearly identical. On its website, Tandem describes two of its drones, the Matrix 5 and Matrix 10, as the "PBAS Tranche 1.1 Winner." Tandem did not exist at the time this selection was made, and Strategic Logix had this title, as publicly recognized by its supplier. *Unusual Machines Congratulates Customers Selected for the Army's PBAS Tranche 1.1, Including Envision Technology and Strategic Logix*, available at: https://www.charlotteobserver.com/press-releases/article313715772.html (last accessed Mar. 26, 2026).

86. Another offering, the Matrix F, is identical to the RRSL Series F, a fiber optic drone that initially put Strategic Logix on the procurement map.

87. Likewise, the Matrix D is wholesale copied from a Strategic Logix offering, as can be confirmed from backpack schematics in the company's possession.

88. Upon information and belief, Valkenburg and Schnipke organized Tandem Defense, then transferred Strategic Logix's contracts, customer information, supplier information, to Tandem Defense.

89. Upon information and belief, Valkenburg and Schnipke sold their equity in Tandem Defense to Powerus,[3] thus removing Orsburn's right to receive fair market value for his interest, and moved to a new entity to avoid their reinstatement obligations and obligation to not discriminate and retaliate against Orsburn under USERRA.

90. Orsburn therefore brings this action to obtain injunctive relief, all available damages, and his reasonable attorneys' fees and costs.

**COUNT I**
**38 U.S.C. § 4311 (USERRA Discrimination and Retaliation)**
**Against All Defendants**

91. Orsburn incorporates by reference Paragraph Nos. 1-90 of his Complaint.

---

[3] Powerus has publicly described Tandem Defense as a "wholly owned subsidiary" of Powerus.

92. Tandem Defense is an "employer" within the meaning of USERRA because it is a successor in interest to Strategic Logix, LLC, a USERRA employer. 38 U.S.C. § 4303(4)(A), (D).

93. Schnipke is an "employer" within the meaning of USERRA because he is a person to whom Strategic Logix and/or Tandem has delegated the performance of employment-related responsibilities and who denied employment to Orsburn.

94. Valkenburg is an "employer" within the meaning of USERRA because he is a person to whom Strategic Logix and/or Tandem has delegated the performance of employment-related responsibilities and who denied employment to Orsburn.

95. Orsburn is an "employee" within the meaning of USERRA. 38 U.S.C. § 4303(3).

96. Orsburn participated in "service in the uniformed services" under USERRA beginning in January 2025.

97. Orsburn made applications for reinstatement directly and through his counsel to Defendants within 90 days of the conclusion of his service in the uniformed services.

98. Defendants refused to reinstate Orsburn.

99. In October 2025, Schnipke and Valkenburg discriminated and retaliated against Orsburn by refusing to continue his employment, denying him

benefits of employment, including salary and benefits, removing his access to Strategic Logix systems, attempting to cancel his 20% membership interest, and exfiltrating assets from Strategic Logix to continue the business through a new entity to avoid compensating Orsburn for his membership interest and to avoid reinstating him.

100. As part of their discrimination and retaliation against Orsburn, Schnipke and Valkenburg coordinated the transfer of Strategic Logix's internal information, business operations, customers, pending orders, government contracts, supplier contracts, and all other essential assets from Strategic Logix to Tandem Defense.

101. Tandem Defense is a successor in interest under USERRA because the company is continuing Strategic Logix's business operations by making the same orders to the same customers using the same suppliers that were used by Strategic Logix led by two of the founders of Strategic Logix.

102. Both companies have a continuity of workforces because Schnipke and Valkenburg controlled both companies.

103. There is no material difference in the jobs and working conditions at both companies.

104. The supervisory personnel are the same or substantially similar at both companies.

105. The production methods at both companies are the same or substantially similar.

106. The products or services offered by both companies are the same or substantially similar.

107. Orsburn's service in the uniformed services and/or his assertion of his rights under USERRA was a motivating factor for Defendants' actions.

108. Defendants' actions were willful and intentional violations of USERRA.

109. Defendants' actions harmed Orsburn by depriving him of wages and benefits, past wages and bonuses, as well as the value of his interest in Strategic Logix.

110. Orsburn seeks to compel Defendants to comply with USERRA, compensate him for lost wages and benefits, award him liquidated damages, and award him interest. 38 U.S.C. § 4323(d).

111. Orsburn also seeks to recover his reasonable attorneys' fees and costs pursuant to 38 U.S.C. § 4323(h).

**COUNT II**
**38 U.S.C. §§ 4312, 4323 (USERRA Reinstatement and Equitable Relief) Against All Defendants**

112. Orsburn incorporates by reference Paragraph Nos. 1-90 and 92-98 of his Complaint.

113. Orsburn is entitled to reemployment with Tandem Defense as a successor in interest to Strategic Logix.

114. Defendants are subjecting Orsburn to ongoing USERRA violations by continuing to discriminate and retaliate against him.

115. Orsburn made timely demands to continue employment at Strategic Logix and Tandem prior to filing this lawsuit.

116. Defendants refused to reinstate Orsburn.

117. Orsburn has complied with all requirements for continued employment.

118. Defendants' actions have deprived Orsburn of the value of his membership interest in Strategic Logix.

119. An injunction is proper under the Court's equitable power because Orsburn is being subjected to ongoing violations of USERRA, the harm to Orsburn outweighs the injury to Defendants, Orsburn is likely to success on the merits of his claims, and awarding this relief is in the public interest.

120. The Court should enter preliminary and permanent injunctive relief finding Tandem Defense to be a successor in interest to Strategic Logix, restoring Orsburn to his position at Tandem Defense, transferring Orsburn 20% of Tandem Defense or 20% of the proceeds from any transaction to acquire Tandem Defense's equity, and enjoining Defendants from retaliating against Orsburn for his exercise of his rights under USERRA.

121. Orsburn also seeks to recover his reasonable attorneys' fees and costs pursuant to 38 U.S.C. § 4323(h).

**WHEREFORE,** Orsburn respectfully requests that the Court award the following relief:

(a) award Orsburn preliminary and permanent injunctive relief, including reinstatement, equity or equity proceeds transfer, a declaration that Tandem Defense is a successor in interest to Strategic Logix, and a declaration that Defendants violated USERRA;

(b) award Orsburn full back pay, including all lost pay and benefits, raises, cost of living increases, retirement benefits, and all other lost benefits and compensation reducible to a dollar amount;

(d) award Orsburn prejudgment interest as required by law;

(e) award Orsburn 20% of Tandem Defense's equity or 20% of the proceeds from any transaction to acquire Tandem Defense's equity;

(f) award Orsburn front pay, including all lost future pay and benefits, raises, cost of living increases, retirement benefits, and all other lost benefits and compensation reducible to a dollar amount;

(g) award Orsburn liquidated damages against Defendants sufficient to punish it for its unlawful conduct and deter it from repeating such conduct in the future;

(h) award Orsburn his reasonable attorneys' fees and expenses; and

(i) grant such additional relief as may be just.

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Orsburn demands a jury trial on all issues so triable.

Respectfully submitted, this 26th day of March, 2026.

*s/ Alex Meier*
Alexander C. Meier
Georgia Bar No. 282350
Cary R. Burke
Georgia Bar No. 757627
LEE MEIER BURKE
695 Pylant Street NE, Suite 105
Atlanta, Georgia 30306
Telephone: (404) 999-4798
ameier@leemeierburke.com
cburke@leemeierburke.com

**COUNSEL FOR PLAINTIFF**