# EXHIBIT 2

# POSITION STATEMENT
### Strategic Logix LLC — Internal Investigation
*Prepared in Response to Request of Independent Counsel*

## I. Introduction and Categorical Denial

Jeremy Schnipke categorically denies each and every allegation of misconduct set forth in the Formal Derivative Demand submitted by Addam Orsburn through counsel on January 17, 2026 ("Demand"). He specifically and unequivocally denies engaging in any misconduct. Furthermore, Mr. Schnipke denies that he has breached his duty of loyalty in any respect.

The allegations of Mr. Orsburn are false, unsupported by the documentary record, and are best understood as a litigation strategy designed to obscure Mr. Orsburn's nine-month voluntary absence from Strategic Logix LLC ("Company") and his subsequent pattern of disruptive, coercive, and harmful conduct. "). It is acknowledged that during the period when Mr. Orsburn had seemingly abandoned the Company, Mr. Schnipke assumed and exercised control of the Company in his capacity as Chief Executive Officer. However, each and every action taken by Mr. Schnipke during that period was undertaken in good faith and in the best interest of the company. Mr. Schnipke's conduct throughout that time was consistent with his obligations and responsibilities as an officer of the company, and any suggestion to the contrary is without merit.

The Demand alleges breaches of loyalty, self-dealing, misrepresentations in connection with governance, diversion of corporate opportunities, and improper insider transactions. Each of these allegations fails on the facts. Mr. Schnipke's role within Strategic Logix has always been operational and administrative — customer satisfaction, procurement, accounting, and back-office operations. He has never been a salesperson or business development professional, and the allegation that he diverted corporate opportunities is factually impossible: one cannot divert opportunities one was never positioned to pursue. Mr. Schnipke saw every contract through to delivery, funded operations personally to the tune of nearly $400,000 over seventeen months, guaranteed the Company's lease, and registered the Company under ITAR — all while Mr. Orsburn, who had obtained explicit military and JAG approval to continue working for the Company during his deployment, chose instead to be absent.

> *The demand is not a good-faith effort to protect the Company. It is a litigation instrument filed by a member who voluntarily abandoned the Company during its most critical growth period — after representing he had approval to remain involved — rejected every good-faith resolution offered upon his return, and then pursued a coordinated campaign of threats, interference, and disruption.*

The sections that follow provide the factual record, categorical responses to each allegation, and the countervailing claims supported by that record.

## II. Background: Company Formation, Jeremy Schnipke's Role, and the Andrew Valkenburg Context

### A. Formation and Initial Operations (September – December 2024)

Strategic Logix LLC was formed on September 10, 2024. Jeremy Schnipke was the organizer, registered agent, and sole member listed on the EIN issued the following day. From the outset, Mr. Schnipke was the operational engine of the Company.

No operating agreement was ever executed. Multiple drafts were circulated — including one by Mr. Schnipke in November 2024, and a competing draft submitted by Mr. Orsburn via Rocket Lawyer. Neither was signed. Governance, therefore, defaults to Georgia's statutory framework.

No formal capital contributions were made by any member. Mr. Schnipke funded operations personally through use of his personal credit, repaid as cash flow permitted, with all transactions properly recorded. (Ex. 7 & 8)

## B. Jeremy Schnipke's Role: Operations, Not Sales

Mr. Schnipke's contributions encompassed customer satisfaction, procurement, accounting, administration, regulatory compliance, facilities, and contract delivery oversight. He has never been a salesperson or held a role with authority over customer origination or sales pipeline. Mr. Schnipke did not contact customers to solicit business for the Company. The relevance of this to the corporate opportunity allegation is addressed directly in Section IV.C.

## C. Andrew Valkenburg: Non-Membership, CSP Restrictions, and Mr. Orsburn's Role in His Departure

The Demand attempts to treat Mr. Andrew Valkenburg's involvement with the Company as evidence of improper governance. In fact, his status and the circumstances of his departure tell a very different story — one that reflects directly on Mr. Orsburn's conduct and character.

### i. CSP Enrollment and Legal Constraints on Membership and Compensation

Andrew Valkenburg participated in the Company through the Army's Career Skills Program (CSP), a transition program that allows active-duty service members to intern with civilian employers in preparation for separation from military service. CSP participation carries meaningful legal and regulatory constraints that were understood by all parties involved:

- CSP participants may not receive compensation from the host employer during their internship period;
- CSP participants may not hold ownership interests in a government contracting or defense-adjacent business during active service, given the inherent conflict of interest between holding equity in a government-facing company and status as an active-duty government employee;
- Any membership or ownership grant would therefore have been legally inappropriate and potentially in violation of federal conflict-of-interest rules applicable to military personnel; and
- Andrew Valkenburg's path to membership was accordingly deferred — explicitly and openly — until he had fully separated from military service.

Mr. Schnipke's November 2024 email to the team acknowledged this directly, noting that the operating agreement would need to be revisited "in about a year when Andrew can officially join as an owner." (Ex. 4) This was not a secret. It was a transparent acknowledgment of a legally constrained timeline.

Andrew Valkenburg did not receive K-1 distributions, ownership documentation, or compensation during his CSP period. His non-member status was not a governance manipulation — it was a legal necessity driven by his active-duty status and the nature of the Company's government-facing operations. Granting him equity while he remained an active-duty government employee working in a defense-adjacent business would have exposed both him and the Company to potential federal conflict-of-interest violations and liability.

> *Andrew Valkenburg's non-membership was not concealment or misrepresentation. It was a legally required deferral, openly communicated, arising from his active military service and the conflict-of-interest restrictions applicable to government employees holding equity in defense-adjacent companies.*

### ii. Mr. Orsburn's Threats Against Andrew Valkenburg and His Role in Andrew's Departure

Andrew Valkenburg resigned as Chief Operating Officer of the Company on December 19, 2025. (Ex. 28) The circumstances of that resignation are directly relevant to this investigation, because they reflect conduct by Mr. Orsburn that goes beyond the governance dispute and into the territory of personal coercion.

It is Mr. Schnipke's understanding, based on communications with Mr. Valkenburg, that Mr. Orsburn made clear to Andrew that he intended to block Andrew's path to membership in the Company permanently — regardless of when Andrew completed his military service or what he contributed to the business. This was not a negotiating position or a good-faith governance disagreement. It was a deliberate effort to foreclose a promised future opportunity as a means of exerting leverage.

Beyond the membership threat, Mr. Orsburn is understood to have made personal threats against Andrew Valkenburg, including:

- Threats targeting Andrew's professional reputation and standing;
- Threats or disclosures related to Andrew's personal conduct and private life; and
- Conduct designed to pressure, intimidate, and destabilize Andrew personally at a time when he was already navigating a military transition.

The combined effect of these threats — the professional threat of permanent membership exclusion and the personal threat of reputational harm — is understood to be a primary driver of Andrew Valkenburg's departure from the Company. A key operational leader was driven out not by business conditions or a legitimate governance decision, but by a co-member's coercive conduct.

> *Mr. Orsburn's threats against Andrew Valkenburg — both the deliberate blocking of his membership path and personal threats — were a direct cause of the loss of a key operational leader. This conduct should also be investigated during this independent investigation to determine what, if any, claims the Company may have against Mr. Orsburn.*

### iii. Mr. Orsburn's Personal Conduct and Its Relevance to This Proceeding

Mr. Schnipke raises the following personal conduct by Mr. Orsburn, not as a gratuitous personal attack, but because it is directly relevant to the credibility of Mr. Orsburn's fiduciary duty claims and to the question of whether any of the remaining members are willing or able to continue in a business relationship with him.

It is Mr. Schnipke's understanding that while Mr. Orsburn abandoned the Company and was on duty with the National Guard, he engaged in extramarital infidelity.  It is also Mr. Schnipke's understanding that, during this period, Mr. Orsburn bragged about his use and sale of anabolic steroids. These facts are raised because they directly inform the character question at the center of this dispute: Mr. Orsburn asserts that Mr. Schnipke and others cannot be trusted and have breached their duties to the Company. The investigator should consider what the record reflects about Mr. Orsburn's own capacity for honesty, loyalty, and good faith.

A person who is willing to deceive a spouse — the individual with whom he has made the most solemn personal commitment of his life, and to whom he owes the highest personal duty of loyalty — and who is willing to do so while that spouse is caring for four children at home, has demonstrated a willingness to place self-interest above obligation when it is convenient to do so. That pattern of conduct does not disappear when the relationship in question is a business partnership rather than a marriage.

Mr. Schnipke does not assert that these facts alone are dispositive. He asserts that they are relevant, that they are consistent with Mr. Orsburn's conduct throughout this dispute, and that the investigator is entitled to consider them as part of a holistic assessment of credibility and character.

Finally, it bears stating plainly: Mr. Schnipke, Mr. Andrew Valkenburg, and others associated with the Company no longer wish to be in business with Mr. Orsburn. This is not solely a governance disagreement or a dispute over ownership percentages. It is a judgment, reached independently by multiple individuals, that Mr. Orsburn's conduct — his threats, his coercion, his personal dishonesty, and his willingness to cause harm to others to advance his own position — makes him an unsuitable business partner. That judgment is shared, it is documented in the record of his conduct, and it is offered here as relevant context for the question of whether the Company could continue to operate with Mr. Orsburn as a member.

## III. Detailed Chronology of Events

The following timeline provides a granular, date-specific record of the events underlying this dispute. It is provided to give the investigator precise reference points and to demonstrate the pattern of escalation, interference, and disruption that defines Mr. Orsburn's conduct during this period. Supporting documentation is referenced throughout by exhibit number.

### A. Formation and Initial Operations (September – December 2024)

09/10/2024 — LLC formed; EIN issued 09/11/2024 listing Jeremy Schnipke as sole member. (Ex. 1 & 2)

**Sept–Dec 2024 — No operating agreement executed.**
Mr. Orsburn's own Rocket Lawyer draft lists only Schnipke, Orsburn, and Neil Valkenburg as owners — zero ownership for Andrew Valkenburg — directly contradicting the cap table his counsel later asserts.

Mr. Schnipke's November 24 email explicitly defers Andrew's membership until after military separation. (Ex. 4, 5, & 6)

Capital: Mr. Schnipke funds operations personally (~$400,000 over 17 months); all transactions recorded. (Ex. 7 & 8)

## B. Period of Authorized, Voluntary Non-Participation (January 2025 – September 2025)

### January 2025 — Mr. Orsburn deploys.

Prior to deployment, Mr. Orsburn personally sought and obtained approval from his chain of command and JAG counsel to continue participating in Strategic Logix during his deployment. He reported to the Company that the military "could not stop him" from working for Strategic Logix, given his self-proclaimed "pivotal" role. He was under no legal or regulatory obligation that would prevent participation.

01/03/2025 – 04/02/2025 — No direct contact with Mr. Schnipke; no tasks, deliverables, or system activity. (Ex. 9 - 13)

### 04/02/2025 — Mr. Orsburn responds once to a company-wide email.

This is the sole documented communication from Mr. Orsburn during the entire nine-month period.

### 04/03/2025 – October 2025 — No further direct contact between Mr. Orsburn and Jeremy Schnipke.

No documented tasks, deliverables, or leadership actions are attributable to Mr. Orsburn during this period.

### 04/27/2025 — Tax documents completed and delivered to all members.

Mr. Schnipke distributes the 2024 business tax return, balance sheet, profit and loss statement, and related financial documents to all members. (Ex. 14 - 20) Full financial transparency is maintained throughout.

### 08/27/2025 — ITAR registration submitted.

Mr. Schnipke submits the DDTC/ITAR registration under his name as the responsible officer. (Ex. 21)

### 09/30/2025 — ITAR registration approved.

Strategic Logix receives ITAR approval under Registration Letter M52349. From this point forward, the Company operates within a regulated defense environment with heightened governance and compliance obligations. (Ex. 22)

## C. Re-Engagement and Immediate Escalation (October 2025)

### Early October 2025 — First meaningful engagement between Mr. Orsburn and Mr. Schnipke since January 2025.

Andrew Valkenburg discusses with Mr. Orsburn that he and Mr. Schnipke do not feel the current ownership arrangement is equitable given Mr. Orsburn's absence. This prompts Mr. Orsburn to reach out to Mr. Schnipke directly. (Ex. 23)

**10/07/2025 — Mr. Schnipke presents three structured resolution pathways.**
- Buyout of Mr. Orsburn's interest;
- Reset and earn-in structure based on future contribution; and
- Employment with vesting arrangement.

**10/13/2025 — Mediation formally proposed.**
At 2:47 PM, Mr. Schnipke explicitly proposes mediation as an additional avenue for resolution. (Ex. 23)

**All resolution pathways rejected.**
Mr. Orsburn declines all proposed options without presenting a counter-proposal or engaging constructively. (Ex. 23)

## D. Threats and Escalation (October 2025)

**10/14/2025, 3:06 PM — Mr. Schnipke directs Mr. Orsburn to route all communications through counsel.**

**10/14/2025, 7:11 PM — Mr. Orsburn calls Andrew Valkenburg.**
During this call, Mr. Orsburn states: (Ex. 24)
- That litigation will "get ugly;"
- That he has evidence the Company is "operating illegally;"
- That he will release information publicly; and
- That he wants to return and "won't hold it against" Andrew if he cooperates.

This call reflects a pattern of coercive communication — threatening harm while simultaneously offering conditional amnesty to induce cooperation.

**10/20/2025 — Formal demand letter received from counsel Jason Gordon.**
The letter asserts Mr. Orsburn's ownership and directs the Company not to alter any ownership percentages. (Ex. 25)

**Mid–Late October 2025 — Mr. Schnipke restricts Mr. Orsburn's system access.**
Following explicit threats, refusal of all resolution options, and the counsel-only instruction, Mr. Schnipke restricts Mr. Orsburn's organizational access. The decision is grounded in contemporaneous concerns regarding ITAR compliance, coercion and blackmail risk, and governance breakdown. (Ex. 23 , 24, & 26)

## E. Escalating Threats and Safety Concerns (November 2025)

**11/21/2025 — Mr. Schnipke emails counsel to document escalating concerns.**
Mr. Schnipke creates a contemporaneous written record documenting genuine personal fear, escalating behavior by Mr. Orsburn, and a desire to establish a record before further events occur. (Ex. 27) This communication predates the subsequent period of intensified disruption and reflects the real-time impact of Mr. Orsburn's conduct on Mr. Schnipke personally.

## F. Company Fracture and Governance Breakdown (December 2025 – January 2026)

**12/19/2025 — Andrew Valkenburg resigns as COO.**

The resignation is understood to be driven in part by Mr. Orsburn's threats against Andrew personally and professionally, and his stated intent to permanently block Andrew's path to membership. (Ex. 28)

**12/22/2025 — Counsel requests owner distribution for Mr. Orsburn.**

Jason Gordon requests that Mr. Orsburn's distribution be deposited directly into his account. On 12/30/2025, Mr. Schnipke mails a cashier's check via certified mail due to the absence of banking details. On 01/02/2026, Mr. Gordon contacts Grace Tillman to return the check, asserting the distribution was not authorized.  To date, this cashier's check has not been received by Mr. Schnipke.  It is unknown if Mr. Orsburn retained the money.

**12/26/2025 — Counsel asserts a new and previously unadvanced ownership structure.**

Jason Gordon asserts the following cap table on behalf of Mr. Orsburn: (Ex. 29)

- Andrew Valkenburg: 35%
- Jeremy Schnipke: 35%
- Addam Orsburn: 20%
- Neil Valkenburg: 5%

This proposed structure notably omits 5%, totaling only 95%, and directly contradicts Mr. Orsburn's own proposed operating agreement, which listed no ownership for Andrew Valkenburg. The assertion that Andrew Valkenburg holds 35% is inconsistent with his CSP status, his non-receipt of K-1s, and all prior documentation.

**12/29/2025 — First members' meeting held, under objection.**

The meeting is convened with proper notice and constitutes a quorum under Georgia's statutory default framework. Formal objections were submitted by Mr. Orsburn's counsel prior to the meeting. The meeting proceeds, and actions taken are procedurally valid under Georgia law regardless of the disputed ownership structure. (Ex. 30 - 32)

## G. Information Demands, Data Incident, and Personnel Departures (January 2026)

**01/02/2026 — Financial documents shared with Mr. Gordon.**

Mr. Schnipke provides financial records to Grace Tillman for transmission to Jason Gordon. (Ex. 33)

**01/07/2026 — All bank records and credit card statements provided to Mr. Gordon.**

A comprehensive record transmittal is completed. Full financial transparency is maintained. (Ex. 34)

**01/07/2026 — Cease and desist received from Mr. Orsburn's counsel.**

The cease and desist is directed at Mr. Schnipke. (Ex. 35)

**01/14/2026, 11:00–11:15 AM — Adam Earhart exports all company CRM data.**

Between 11:00 and 11:15 AM, employee Adam Earhart (an employee of the Company who had a prior friendly relationship with Mr. Orsburn) exports all Company deals, contracts, and contacts from HubSpot

without notice, authorization, or identifiable business purpose — during an active ownership dispute and immediately prior to a series of employee departures. (Ex. 36 - 39)

- Data exported includes: full contact database and all active deal pipeline records.
- At approximately 12:30 PM, Mr. Earhart's access is restricted.
- At 3:31 PM, Mr. Earhart calls Mr. Schnipke regarding his restricted access.
- Mr. Earhart is placed on paid administrative leave pending investigation by his direct supervisor, Aaron Smith.
- Mr. Earhart's formal response to investigative questions is returned on 01/15/2026. (Ex. 40)

**01/16/2026 — Aaron Smith resigns.**

Mr. Smith submits his resignation effective January 26, 2026. (Ex. 41)

**01/17/2026 — Andrew Valkenburg informed that Mr. Orsburn has been contacting former employees.**

A former employee contacts Andrew Valkenburg to report that Mr. Orsburn has been reaching out to Company personnel during the active dispute. (Ex. 42)

**01/19/2026 — Formal derivative demand received. (Letter date 1/17/2026)**

The demand is received from Jason Gordon on behalf of Mr. Orsburn. It is the subject of this position statement. (Ex. 43)

**01/19/2026 — Brian Baswell informs Mr. Schnipke of intent to seek new employment.**

(Ex. 44)

**01/19/2026 — Matthew Short informs Andrew Valkenburg that Mr. Orsburn has contacted him again.**

**01/20/2026, 8:30 PM — Members' meeting held.**

Members vote to limit social media posts to member-approved content only. Jason Gordon inquires whether anyone is representing Strategic Logix at the PBAS conference — Mr. Orsburn had posted twice (approximately 01/14/2026 and 01/18/2026), representing that the Company would be present, without authorization. A proposal for a neutral third-party investigation is supported by all members pending final approval of an investigator. (Ex. 45 & 46)

**01/21/2026, approximately 9:00 AM — Mr. Orsburn posts Jeremy Schnipke's personal identifying information on LinkedIn.**

Mr. Orsburn, without consent or authorization, publishes a LinkedIn post asking others to contact Mr. Schnipke directly, including his personal identifying information. This conduct is retaliatory, harmful, and bears no relationship to any legitimate Company interest. (Ex. 47)

**01/23/2026 — Mr. Gordon requests that Mr. Orsburn be placed in charge of the neutral investigation.**

(Ex. 48) This request is inconsistent with the premise of a neutral investigation and is rejected.

**01/26/2026 — Mr. Gordon formally rejects any investigation structure that does not grant Mr. Orsburn primary control.**

Mr. Gordon's response asserts Mr. Orsburn must serve as the primary point of contact for any investigation; demands unrestricted system access; characterizes the absence of produced documents as bad faith; disputes the relevance of ITAR compliance to access controls; proposes a unilateral buyout without mutual buy-sell terms; and requests the investigation focus on Mr. Schnipke and Andrew Valkenburg's conduct. (Ex. 49)

**01/27/2026 — Mr. Schnipke's counsel responds to Mr. Gordon.**

Counsel: confirms representation of Mr. Schnipke only; acknowledges Mr. Orsburn as a member and denies Andrew Valkenburg's membership; requests documentary support for Gordon's ownership claims; confirms K-1s were provided; rejects any investigation structure controlled by Mr. Orsburn; preserves privilege and access controls; disputes Mr. Gordon's ITAR characterization; and agrees to provide PBAS materials subject to ITAR and confidentiality requirements. (Ex. 50)

# IV. Categorical Denial of Each Allegation in the Derivative Demand

The derivative demand identifies five categories of alleged misconduct. Each is addressed below and categorically denied.

## A. Denial: Breach of Duty of Loyalty and Self-Interested Governance

The Demand alleges that Mr. Schnipke "unilaterally consolidated control" and "excluded Mr. Orsburn from governance." These allegations mischaracterize the facts.

Mr. Schnipke did not consolidate control as a scheme or strategy. He managed an operational company during a period when the only other substantive member (Mr. Orsburn) had represented that he would participate, but then chose not to.[1] The decisions made during that period were not made to exclude Mr. Orsburn — they were made because the Company required ongoing management, and Mr. Orsburn, despite having approval and opportunity to engage, was not present.

When Mr. Orsburn re-engaged in October 2025, he was not excluded from governance. He was offered pathways to involvement — earn-in or employment with vesting. Mr. Orsburn was offered mediation as an option to attempt to resolve the conflict. He rejected all of them. (Ex. 23) The restriction of system access that followed occurred after explicit threats, refusal of all cooperative options, and a counsel-only instruction — and was grounded in documented concerns about ITAR compliance, coercion risk, and governance breakdown.

As to compensation and bonuses: any compensation arrangements approved by active management were made in the course of operating an active business during Mr. Orsburn's voluntary absence. Financial records reflect these transactions accurately. No member approval was improperly circumvented; there was no signed operating agreement establishing any approval threshold for compensation decisions, and default statutory governance was followed.

---

[1] Neil Valkenburg is and at all times relevant hereto has been a member of the Company holding a 5% interest. Mr. N. Valkenburg, who is an accountant by profession, was intended to be used more in that capacity for the benefit of the Company in the future.

> *DENIED. Mr. Schnipke managed an operational company during Mr. Orsburn's voluntary absence out of necessity. Access was restricted after threats, not as a governance strategy. Compensation decisions were consistent with default statutory governance.*

## B. Denial: Ownership and Governance Misrepresentations

The Demand alleges that Mr. Schnipke and others made misleading representations about membership and ownership structure to distort voting and governance outcomes.

This allegation is false. The documentary record — including Mr. Orsburn's own proposed operating agreement — reflects that the ownership question was openly discussed among all relevant parties from the earliest days of the Company. (Ex. 3 – 6, 14 - 20) No member was designated or excluded through concealment.

The position taken by Mr. Schnipke's counsel on January 27, 2026 — acknowledging Mr. Orsburn as a member while denying Andrew Valkenburg's membership — is consistent with the documented record and was stated openly and in writing. This is not misrepresentation. It is a documented, good-faith legal position.

Andrew Valkenburg's deferred membership was legally required by his CSP status and active-duty service obligations, openly acknowledged in contemporaneous communications, and never misrepresented to any party.

> *DENIED. Ownership positions were openly communicated and documented. Andrew Valkenburg's non-membership was a legally mandated deferral, not a governance manipulation. The December 2025 meeting was procedurally valid.*

## C. Denial: Diversion and Misuse of Company Assets and Opportunities

The demand alleges that the Company's intellectual property, customer relationships, and business opportunities were diverted for insider benefit.

This allegation fundamentally misunderstands Mr. Schnipke's role. He is not a salesperson. He has never originated or controlled customer relationships in a business development capacity. His function was operational: procuring, executing, and fulfilling. He ensured that every contract the Company won was delivered — he did not source those contracts, and he has never redirected a business opportunity away from the Company for personal gain.

There is no documentation, communication, or evidence of any kind in the record reflecting an intent by Mr. Schnipke to divert corporate opportunities. The demand does not identify a single specific transaction, contract, or customer relationship that was improperly redirected. It offers generalized allegations without factual anchoring.

> *DENIED. Mr. Schnipke is not and has never been in a sales or business origination role. He has not and cannot have diverted opportunities he was not positioned to pursue. No specific transaction is identified in the demand because none occurred.*

JEREMY SCHNIPKE — POSITION STATEMENT

## D. Denial: Improper Insider Transactions and Contracting

The Demand alleges that insiders authorized or ratified transactions that drained the Company's value, including improper bonuses and compensation arrangements.

This allegation lacks factual support. Financial records produced to Mr. Orsburn's counsel — including bank statements, credit card registers, and accounting records — reflect all transactions accurately and in detail. (Ex. 7, 8, 33, & 34) No amounts were concealed. No transactions were disguised. The Company's 2024 tax return and associated financial documents were shared with all members on March 27, 2025. (Ex. 14 - 20)

Any compensation paid to active management or employees reflects ordinary business operations conducted during a period when Mr. Orsburn was voluntarily absent, despite having approval and opportunity to participate. These decisions were consistent with Georgia's statutory default governance framework.  It would be unrealistic, not to mention a potential violation of the law, to expect employees to work for no compensation.

> *DENIED. All financial transactions are documented and disclosed. Compensation decisions were consistent with governing law and ordinary business operations.*

## E. Denial: Improper Dissolution Activity

The Demand alleges that Mr. Schnipke and others have proposed dissolution in order to suppress Company claims.

This allegation inverts the timeline and ignores the operative context. The Company's governance has been materially impaired by Mr. Orsburn's own conduct — threats, interference, unauthorized communications, data access incidents, and destabilization of the workforce. The Company is also subject to ITAR obligations that create heightened governance requirements it can no longer reliably satisfy under current conditions.

Any discussion of dissolution has been in the context of a Company that, as a practical matter, can no longer function in a stable, compliant, and sustainable manner. Dissolution in that context is not a scheme to suppress claims — it is a legally available structural remedy for an entity that has lost functional governance.

Moreover, any dissolution would be conducted under Georgia law, which affirmatively requires the preservation and pursuit of Company claims as part of the winding-up process. The allegation that dissolution would suppress claims assumes that Georgia law would be violated in the process — an assumption without basis.

> *DENIED. Dissolution has been considered as a structural remedy for a Company that can no longer be governed effectively. Georgia law protects the Company's potential claims through the winding-up process.*

# V. Counter-Claims: Conduct by Mr. Orsburn Causing Harm to the Company

**JEREMY SCHNIPKE — POSITION STATEMENT**

The factual record does not merely refute the allegations in the derivative demand. It affirmatively supports claims by the Company arising from Mr. Orsburn's conduct. The following are identified for investigation and evaluation.

## A. Breach of Fiduciary Duty

Mr. Orsburn, as a member of a member-managed LLC, owes duties of loyalty and care to the Company. The record reflects that he:

- Secured approval from his chain of command and JAG to continue participating in the Company during deployment, represented to his partners that he would do so, and then chose not to — abandoning the Company during its most critical operational period;
- Failed to complete any documented tasks, deliverables, or leadership actions over the nine-month period of his absence despite having the explicit authorization and stated intention to remain involved;
- Rejected all good-faith resolution offers upon re-engagement, preferring escalation over cooperation and wasting corporate resources;
- Threatened litigation, public disclosure, and claims of illegality as leverage rather than pursuing internal resolution;
- Made personal threats against a key operational leader (Andrew Valkenburg) that contributed directly to his departure;
- Engaged in unauthorized communications with customers, misrepresenting management's availability and authority; and
- Contacted Company employees during an active dispute in a manner that contributed to workforce instability and departures.

None of these actions served the Company's interests. Each of them served Mr. Orsburn's personal posture at the expense of the business he now claims to be protecting.

## B. Fraudulent Misrepresentation to Business Partners

Prior to deployment, Mr. Orsburn represented to Mr. Schnipke and other Company leadership that he had obtained approval from his chain of command and JAG to continue participating in Strategic Logix during deployment, and that he intended to do so. This representation was made to induce the Company and its active members to continue planning and operating with the expectation of Mr. Orsburn's involvement. It was also material in having Mr. Orsburn become and/or remain a member of the Company.

That representation was false in its effect — Mr. Orsburn did not participate. Whether it was false at the time it was made or became false through a subsequent decision to prioritize personal pursuits over his stated commitment, the result was the same: Company leadership operated under a material misapprehension about the business's governance and participation structure throughout its most critical growth period.

> *A member who represents that he will remain involved, uses that representation to obtain and/or preserve his governance position and ownership claim, and then chooses personal travel and personal pursuits instead, has not merely been absent. He has obtained something of value — the preservation of his membership stake — through a false representation. That is a matter for investigation.*

## C. Tortious Interference with Business and Employment Relationships

Mr. Schnipke has learned that Mr. Orsburn communicated with the Company's customers during this dispute in a false and misleading manner.  Mr. Orsburn stated that "Andy and Jeremy are on vacation and asked me to reach out" — a representation that was false and unauthorized. He also posted on LinkedIn representing the Company's presence at the PBAS conference without authorization, after a member vote restricting such communications. (Ex. 45 & 46)

Further, Mr. Orsburn contacted Company employees, without a legitimate reason, during an active ownership dispute, in a manner that coincided with a series of employee departures.  Upon information and belief, Mr. Orsburn's actions directly impacted employment relations. Mr. Orsburn's threats against Andrew Valkenburg — including threats to block his membership path and personal threats — directly caused Mr. Valkenburg to depart the Company. (Ex. 24)

## D. Misrepresentation and Unauthorized Use of Corporate Authority

Mr. Orsburn's communications to customers and the public represented him as holding operational authority he did not possess. Mr. Orsburn's unauthorized January 21, 2026, LinkedIn post providing Mr. Schnipke's personally identifying information reflects conduct that was retaliatory, harmful, and inconsistent with any cognizable Company interest. (Ex. 45 – 46)

## E. Harm from Unauthorized Data Export

On January 14, 2026, an employee exported the Company's complete CRM contact database and active deal pipeline without authorization, during the active dispute, and immediately prior to the employee departure. (Ex. 36 - 40) The timing, the absence of any legitimate business purpose, the prior relationship between Mr. Orsburn and this employee, and the proximity to subsequent personnel actions warrant a full investigation into whether this export was coordinated with outside parties.

## F. Financial Harm from Operational Disruption

The cumulative effect of the conduct described above has caused material operational and financial harm to Strategic Logix LLC, including:

- Loss of key sales and operational personnel, including the Company's COO;
- Disruption to active contract execution and customer relationship management;
- Diversion of management time and resources from operations to dispute management;
- Increased legal and administrative costs; and
- Material impairment of the Company's forward-looking revenue capacity.

# VI. Closing Statement

Jeremy Schnipke built Strategic Logix LLC. He capitalized it, leased its facility, registered it under ITAR, and provided all operational support through contracts and customer relationships — all while another claimed member secured permission to remain involved, told the other members of the Company he would remain involved, and then chose not to.

That choice — to pursue personal travel and a personal relationship rather than honor a commitment to the Company during its most critical period — is not a footnote in this dispute. It is the central fact. Everything that followed — the ownership claims, the derivative demand, the threats, the interference — flows from a

member who voluntarily stepped away from the Company while it was being built around him, and who now demands the full rewards of that construction.

When Mr. Orsburn returned, Mr. Schnipke offered three structured pathways to resolution and explicitly proposed mediation. Every offer was rejected. What followed was not governance — it was a campaign of threats, coercion, and disruption that drove out a key leader, destabilized the workforce, and interfered with customer relationships.

Multiple individuals — independently and for their own reasons — have concluded that they cannot and will not continue in a business relationship with Mr. Orsburn. That is not a conspiracy. It is a judgment grounded in documented experience.  Mr. Schnipke does not want to continue in a business relationship with Mr. Schnipke, nor should he be obligated to do so.

Mr. Schnipke has not breached any duty owed to the Company.  He has not diverted any corporate opportunity nor has he tried to actively harm the Company in any way.  Mr. Schnipke has not contacted any customer of the Company for any purpose other than furthering the Company's interests by fulfilling their orders.

Mr. Schnipke is committed to providing all assistance to the investigator as may be requested.  Mr. Schnipke will provide access to all relevant documents and communications for the investigator's review.

The investigator is respectfully asked to follow the documentary record. It tells a different story than the one presented in the derivative demand.

> *Jeremy Schnipke denies all allegations in the derivative demand, affirms that his conduct throughout was consistent with the duties of an active, contributing member of a member-managed LLC, and calls for investigation of the conduct described in Section IV as the actual source of harm to the Company.*