**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION**

| | |
|---|---|
| Addam Orsburn,<br><br>Plaintiff,<br><br>v.<br><br>Tandem Defense LLC, Jeremy Schnipke, Andrew Valkenburg, Neil Valkenburg, and Autonomous Power Corporation d/b/a Powerus,<br><br>Defendants. | CIVIL ACTION<br>No.: 1:26-cv-01637-VMC<br><br>JURY TRIAL DEMANDED |

# AMENDED COMPLAINT

## I. INTRODUCTION

1. This case is about friendly fire. Three military friends founded a company, Strategic Logix, LLC, to fix what they saw as problems in the procurement process.

2. One of those founders, Plaintiff Addam Orsburn, was called back for deployment just as the company experienced rapid growth.

3. During Orsburn's deployment, Strategic Logix experienced extraordinary growth and success as the Trump administration prioritized domestic defense capabilities and unmanned aerial vehicles, commonly called "drones."

4. By the summer of 2025, Strategic Logix had received investment offers valuing the company from $400 million to $750 million.

5. Two of the other founders, Defendants Andrew Valkenburg ("A. Valkenburg") and Jeremy Schnipke, set in motion a scheme to eliminate Orsburn's membership so they could fully capture the company's appreciation in value. As the end of Orsburn's deployment approached, Schnipke and A. Valkenburg attempted to separate Orsburn from his equity for dramatically less than it was worth and refused to allow him to return to the company as the Director of Business Development.

6. When those efforts failed, A. Valkenburg and Schnipke, with the assistance of Defendant Neil Valkenburg ("N. Valkenburg") stripped Strategic Logix for parts by transferring its intellectual property, project pipeline, customer information, supplier information, and procurement selections, then cloned the company in a new limited liability company, Defendant Tandem Defense LLC, from which Orsburn was excluded.

7. A. Valkenburg openly told others that Strategic Logix would "dissolve" and they were "rebranding" where he and Schnipke would continue operations under a new name.

8. And, when Orsburn sought to hold A. Valkenburg, Schnipke, and Tandem Defense accountable for their misconduct, Tandem Defense's parent company, Autonomous Power Corporation d/b/a Powerus ("Powerus"), engaged in

corporate gymnastics to move Tandem Defense's operations to Powerus in an effort to shield assets from collection.

9. In another lawyer-created fiction, upon information and belief, attorneys for Tandem Defense or Powerus caused Schnipke to re-hire Orsburn as the Director of Business Development at Strategic Logix, even though Schnipke and A. Valkenburg had caused Strategic Logix to cease essentially all operations, told customers and suppliers that Strategic Logix had "dissolved" or shut down, and "rebranded" Strategic Logix as Tandem Defense.

10. But no matter how many corporate contortions Defendants try, they cannot escape that Defendants deprived Orsburn of his position at Strategic Logix and the value of his membership interest in Strategic Logix by refusing to reinstate him, then transitioned Strategic Logix's operations to Tandem Defense in violation of their common-law and statutory obligations.

11. Orsburn therefore brings this action to vindicate his rights under the Uniformed Services Employment and Re-employment Rights Act of 1994 ("USERRA") and under common law to recover the value of his membership interest, compensatory damages, liquidated damages, punitive damages, his reasonable attorneys' fees and costs, and preliminary and permanent equitable relief.

## II. JURISDICTION AND PARTIES

### *A. Subject Matter Jurisdiction*

12. The Court has original subject matter jurisdiction over Orsburn's USERRA claims under 28 U.S.C. § 1331. The Court also has original subject matter jurisdiction over Orsburn's common-law claims because complete diversity of citizenship exists and the amount in controversy for each common-law claim exceeds $75,000 and exceeds in aggregate $30 million.

13. Orsburn is a citizen of Oklahoma.

14. Schnipke is a citizen of Georgia.

15. N. Valkenburg is a citizen of Montana.

16. Upon information and belief, A. Valkenburg was a citizen of Georgia at the time Orsburn filed his original Complaint.

17. Tandem Defense is a citizen of Delaware and Florida.

18. Autonomous Power Corporation is a citizen of Delaware and Florida.

19. Complete diversity exists because no defendant is a citizen of Oklahoma.

20. The Court has supplemental jurisdiction over all claims for which it lacks original subject matter jurisdiction pursuant to 28 U.S.C. § 1367 because these claims arise out of the same common nucleus of operative facts as the claims over which the Court has original subject matter jurisdiction.

### *B. Personal Jurisdiction*

21. This Court has general personal jurisdiction over Schnipke and A. Valkenburg because they are citizens of the State of Georgia or were at the time Orsburn filed his Complaint.

22. The Court has specific personal jurisdiction over Tandem Defense, A. Valkenburg, N. Valkenburg, and Schnipke because the acts or omissions underlying Orsburn's claims substantially occurred in the State of Georgia, including the operation of Strategic Logix, governance meetings, migration of Strategic Logix's operations and activities to Tandem Defense, and Tandem Defense's organization and operation within the State of Georgia.

23. The Court has specific personal jurisdiction over Powerus because the tortious activity alleged in this Complaint occurred in the State of Georgia and acts and omissions by Valkenburg, Schnipke and Tandem Defense, as agents of Powerus, occurred in the State of Georgia.

### *C. Venue*

24. This Court is a proper venue for Orsburn's claims under 28 U.S.C. § 1391(b) and (c), as a substantial part of the events giving rise to Orsburn's claims occurred in this District and a defendant is subject to the Court's personal jurisdiction in this District.

25. This Court is also a proper venue because Tandem Defense is a private employer and it maintains a place of business in this District at 6600 Peachtree Dunwoody Road, Bldg. 600, Suite 255, Atlanta, GA, 30328.

26. Divisional venue is proper in the Atlanta Division because Schnipke is a resident of Gwinnett County.

***D. The Parties***

27. Plaintiff Addam Orsburn is a citizen and resident of Oklahoma.

28. Defendant Tandem Defense LLC is a Georgia limited liability company with its principal place of business located at 6600 Peachtree Dunwoody Road, Bldg. 600, Suite 255, Atlanta, GA, 30328. Tandem Defense may be served through its registered agent, SK Legal Group, LLC, at the same address as its principal office.

29. Defendant Jeremy Schnipke is a citizen and resident of Georgia, and he may be served at his residence located at 6175 Trail Hikes Drive, Sugar Hill, GA 30518.

30. Upon information and belief, defendant Andrew Valkenburg is a citizen and resident of Georgia, and he may be served at his residence located at 28 Spartina Lane, Richmond Hill, GA 31324.

31. Defendant Neil Valkenburg is a citizen and resident of Montana, and he may be served as his residence located at 2118 10th Ave. N. Billings, MT 59101.

32. Defendant Autonomous Power Corporation d/b/a Powerus is a Delaware corporation with its principal place of business at 515 N. Flagler Drive, Suite 350, West Palm Beach, FL 33401. Powerus is not registered to do business in Georgia and does not have a registered agent listed in Georgia.

33. Because Powerus is not registered to do business in Georgia, the company may be served by registered or certified mail to its Secretary, James Biehl, at 515 N. Flagler Drive, Suite 350, West Palm Beach, FL 33401.

## III. FACTUAL ALLEGATIONS

### *A. Strategic Logix's Formation*

34. Addam Orsburn, Jeremy Schnipke, and A. Valkenburg met each other through their shared service in the military.

35. A. Valkenburg worked as an S4 procurement officer, a role that gave him deep insight into the military's convoluted procurement process. He observed the disconnect that occurred between what ground-level troops needed and the procurement process set from on high. So he had the idea to start a company that would provide ground-floor procurement and modernization support to the military. He named the company Strategic Logix.

36. When he started the company in September 2024, A. Valkenburg remained an active member of the armed forces, so he began with his home brigade as a testing ground. Strategic Logix began by fulfilling procurement needs for A.

Valkenburg's brigade before spreading to other units at the same military installation.

37. From the beginning, A. Valkenburg orchestrated the company's operations. He also set the initial structure; he, Schnipke, Orsburn, and A. Valkenburg's brother, N. Valkenburg, each held equity in the company.

38. Orsburn's initial role and duties focused on sales, where he assisted the company in generating potential procurement partners and obtaining new contracts for the company.

39. At first, Orsburn received a 5% membership interest in Strategic Logix, as well as a percentage of the revenue for contracts he landed for the company.

40. Due to Orsburn's early success in his role, A. Valkenburg removed the commission component of Orsburn's compensation, increased his membership interest from 5% to 20%, and gave him the title of Director of Business Development.

41. A. Valkenburg still had concerns about officially acknowledging his membership interest while still on active duty status, so he and Schnipke settled on a temporary ruse. In two separate conversations, A. Valkenburg and Schnipke told Orsburn that, while A. Valkenburg expected to leave active service soon due to a medical retirement, they would provide a different membership allocation on paper until January 1, 2025, his anticipated separation date.

42. Until then, the allocation on paper would be as follows:

- Schnipke would on paper own a 75% interest in Strategic Logix, and N. Valkenburg, A. Valkenburg's brother, would hold a 5% interest.
- When A. Valkenburg finished his service, Schnipke and A. Valkenburg would equally split the 75% interest held by Schnipke so each held 37.5% or 40% of the company.[1]
- Orsburn would hold the remaining 20%.
- A. Valkenburg would continue to actively work for the company during his remaining service and conceal his dual role.

43. A. Valkenburg remained fully involved in Strategic Logix, where he played a major role in operational decisions, business development, contract development, and administration.

44. A. Valkenburg also continued to direct Orsburn's work on a day-to-day basis while also taking steps to hide his involvement. For example, A. Valkenburg sent emails from Schnipke's email account, drafted emails for others to send, and avoided public messages relating to Strategic Logix.

45. Schnipke, A. Valkenburg, and others also remarked that A. Valkenburg was not "officially" or "technically" involved in Strategic Logix.

46. In November 2024, Schnipke prepared an initial operating agreement for Strategic Logix. The operating agreement set the membership allocation as follows: (1) Schnipke at 75%; (2) N. Valkenburg at 5%; and (3) Orsburn at 20%.

---

[1] In some communications, N. Valkenburg retained a 5% interest. In others, A. Valkenburg listed only himself, Schnipke, and Orsburn as members.

47. The draft operating agreement included a fourth empty signature block that, at one point, listed A. Valkenburg as a member.

48. The draft operating agreement also provided that "***All Members, including Addam Orsburn***, will be employed by the LLC and will receive a fixed salary in addition to their ownership distributions."

49. The draft operating agreement further provided that Schnipke would act as the CEO and Managing Member, with "final authority" for decisions.

50. As 2024 drew to a close, Strategic Logix continued to experience significant growth. By the end of the year, A. Valkenburg told Orsburn and Schnipke that the "worst case scenario" was that the company was worth $20 million, and the valuation could be as high as $47 million. A. Valkenburg then provided breakdowns of how the members would profit from a sale at those values where he identified himself as a member of Strategic Logix.

***B. Orsburn Receives Orders for Federal Service***

51. In late 2024, Orsburn received final orders to report for federal service through the Oklahoma National Guard. Orsburn notified A. Valkenburg and Schnipke after he received orders and before his reporting date in 2024.

52. Orsburn's orders provided that his service began in January 2025, could last for as long as 400 days, though based on prior deployments, the end date could be as early as Thanksgiving of 2025.

53. During Orsburn's deployment, he remained involved in Strategic Logix's operations. He regularly discussed developments with A. Valkenburg and worked with him on business development and procurement opportunities.

### *C. Strategic Logix Experiences Rapid Growth*

54. As Strategic Logix matured, the company found product-market fit in drone procurement.

55. One of Strategic Logix's offerings, the Rapid Reconfigurable Systems Line ("RRSL"), a modular platform for various drone use cases, garnered significant interest. Strategic Logix obtained Blue UAS certification for the platform, a certification confirming security and procurement standards set by the Department of Defense. And, in May 2025, the RRSL took second place at a drone competition.

56. These successes harbored far bigger opportunities for the company. In the summer of 2025, Strategic Logix was invited to submit a proposal for the Army Purpose-Built Attritable System ("PBAS") program of record. If selected, the company would have a multi-year purchasing pipeline likely to exceed $100 million in revenue.

57. These tailwinds led A. Valkenburg to assign increasingly lofty valuations to the company. By February 2025, A. Valkenburg said that Strategic Logix was "inches away from being a half a billion dollar company."

58. And the growing interest and demand for drone and counter-drone solutions also created significant investor interest in Strategic Logix that matched or exceeded A. Valkenburg's forecasted valuations.

59. On May 17, 2025, A. Valkenburg told Orsburn that he had "an offer for $40M for 10% and I'm considering taking it but we need to create 10% so I have a proposal." In another message later that day, A. Valkenburg expressed that his goal was to sell 10% of the company at a $746 million valuation rather than at a $400 million valuation.

60. A. Valkenburg relayed to Orsburn that he was "negotiating us salaries if we do sell out and advisory roles. It's a nonnegotiable in fact."

61. In June 2025, A. Valkenburg told Orsburn that one investor had expressed interest in buying 75% of Strategic Logix for $250 million, with each member receiving a salaried position and a pro rata reduction in their current interest.

62. In May 2025, A. Valkenburg and Schnipke prepared a pitch deck for investors with the assistance of Brett Velicovich, a consultant who later became one of Powerus's "founding team members."

63. In the pitch deck, A. Valkenburg and Schnipke discuss the state and size of the drone market while defining the Strategic Logix RRSL's main benefits as: (1) scalability; (2) modularity; (3) ease of repair; (4) reusability; and (5) an established and verified U.S.-based supplier network.

64. A. Valkenburg and Schnipke represented that Strategic Logix's projected weighted revenue was $220 million and set an implied valuation of ***$1.76 billion*** for the company.

65. In this investor pitch deck, A. Valkenburg and Schnipke listed a drone manufacturer as a "comparable business" to Strategic Logix.

66. On July 19, 2025, A. Valkenburg told Orsburn that they had paused investment discussions because "the proposed valuation is now a somewhat reasonable first year profit goal."

67. In August 2025, A. Valkenburg set up benefits for the group through Insperity and began the process to begin paying salaries for each of the employees/members. When he communicated the benefits to Schnipke, N. Valkenburg, and Orsburn, he recognized, "***For owners***, if ***we*** fund ***our*** benefits out of pocket, it is post tax, as that is **a** rule for S Corps. So, the company will be funding ***our*** benefits."

68. A. Valkenburg's signature block still identified him as a Partner in Strategic Logix.

69. By early September 2025, the company's pipeline was bursting with orders. On September 9, 2025, A. Valkenburg provided a summary to Orsburn outlining the company's pending sales. The total exceeded $30 million, excluding any award from the PBAS program.

70. Then the PBAS selections arrived. Strategic Logix had been selected. The selection—beyond the immense revenue directly available under the program—also gave Strategic Logix the ability to market some of its drones as "program of record" selections, tantamount to the Army's seal of approval and an incredibly potent qualification to highlight in bids for other government contracts.

71. The incoming revenue and demand for Strategic Logix's drones was so significant that, by October 17, 2025, Strategic Logix placed a $12.8 million order for 160,000 drone components from Unusual Machines, its primary supplier. *Strategic Logix Logs $12.8M Purchase of over 160,000 Drone Components for 2026*, available at: https://strategic-logix.com/news/about/strategic-logix-logs-12-8m-purchase-of-over-160 (last accessed Mar. 26, 2026).

72. Around the same time that Strategic Logix received the PBAS selection, A. Valkenburg continued work on setting up payroll by listing his start date as September 11, 2024 and changing his status from "unpaid" to "contractor" effective September 28, 2025.

73. A. Valkenburg and Orsburn also discussed what Orsburn's salary would be. Orsburn asked for his salary to be set for $215,000, $5,000 more than he had ever made, and A. Valkenburg agreed.

74. In or around September 16, 2025, Orsburn received a message from A. Valkenburg to call him because he had received an offer to buy. During the call, A.

Valkenburg told Orsburn that the sale offer was for something around $60 million to $70 million, plus receiving stock in the new company, and employment contracts. A. Valkenburg asked Orsburn if he was still fine with a salary of $215,000 a year, and Orsburn confirmed that he was.

75. In the same or roughly contemporaneous conversation, A. Valkenburg told Orsburn that N. Valkenburg had "given back" his 5% interest because he did not feel like he did enough work for the company to warrant receiving that amount of money. Instead, A. Valkenburg said his brother requested, "Buy me a house when y'all get rich."

76. On information and belief, this was an attempt by A. Valkenburg and Schnipke to provide a predicate for them to demand that Orsburn likewise give up his equity that, according to Valkenburg's valuations, was worth tens of millions of dollars.

77. Through late September to early October 2025, Orsburn kept A. Valkenburg apprised on his upcoming return from his deployment. Valkenburg and Schnipke, on the other hand, began to act on their scheme to discriminate and retaliate against Orsburn.

78. In early October, A. Valkenburg called Orsburn and said he needed to convey "bad news": A. Valkenburg and Schnipke did not feel that the current ownership structure was "equitable" given Orsburn's "absence" caused by his

USERRA-protected service. A. Valkenburg told Orsburn that he was going to receive an offer to buy out his 20% interest in the company from Schnipke.

79. On Tuesday, October 7, 2025, Schnipke sent a proposal to Orsburn to eliminate his equity for far below the lofty valuations he and A. Valkenburg had assigned to Strategic Logix. He began by claiming that the "verbal agreements we made at the start" had not held up, that "Andrew [Valkenburg] and [Schnipke] have put in thousands of hours . . . to keep the company moving forward," and "the structure we started with no longer reflects how things stand today."

80. Schnipke continued that, while he understood "there were limits on what [Orsburn] could do while deployed, the reality is that the expected level of contribution didn't materialize and we can't base ownership on the promise of future involvement that never came together."

81. He acknowledged that Orsburn's deployment created "limitations" but "the level of involvement hasn't been in line with what would make ***the current arrangement*** equitable." From that, Schnipke said that "we," referring to himself and A. Valkenburg, saw two options:

> 1. Buyout – we buy out your interest and you sign a release of equity.
>
> 2. Reset & earn-in – reduce equity to zero for now, with a moderate salary and the opportunity to earn equity options tied to future contributions and performance.

82. In separate conversations, Schnipke suggested a payment of $20,000 to $30,000 for Orsburn's 20% interest—a far cry from the tens of millions Schnipke and A. Valkenburg sought from investors for an equivalent position of the company.

83. Orsburn responded that he felt like he was being punished for his deployment. He also relayed that he had turned down other opportunities "to honor my agreement to come back to the company."

84. Schnipke complained that he and A. Valkenburg "didn't anticipate that we would need to provide ongoing direction for [Orsburn] to engage." Schnipke then lectured Orsburn that "***Ownership*** carries an expectation of initiative, risk and accountability—that's the standard ***Andrew and I*** have held ourselves to ***since day one***."

85. The same day, A. Valkenburg told Scotti Orsburn, Orsburn's wife, that Orsburn still had his job at Strategic Logix and this discussion was limited to Orsburn's equity.

86. Over the following days, Orsburn and A. Valkenburg exchanged a series of potential proposals for Orsburn to return to his job at Strategic Logix. Orsburn offered to reduce his equity from 20% to 10% with an earn-in for the remaining 10%, but Schnipke declined to accept that proposal or any resolution other than Orsburn selling his equity for next to nothing.

87. Orsburn refused to give up or sell his equity for next to nothing.

88. In response, Schnipke told Orsburn, "I've noted your response. We'll be moving forward through counsel to finalize the formal process and ensure everything is handled correctly. You'll receive official notice and documentation outlining next steps. Please direct any further questions through our attorney once that's been sent."

89. On October 14, 2025, Orsburn called A. Valkenburg and had a 23-minute FaceTime meeting with him. During this meeting, A. Valkenburg told Orsburn that what Schnipke was doing was wrong and he did not want this, but he would never go against Jeremy.

90. Orsburn told A. Valkenburg that they were making a huge mistake and that their efforts to hide the true ownership and employment with the company would come out in a dispute. He conceded, "Yeah, that's not ideal."

91. A. Valkenburg then asked Orsburn whether he cared about the company. He responded, "Of course I do. That's why I'm begging you guys to not do this." A. Valkenburg responded with something like, "This is wrong, this is not what I wanted. I'll fix this. I gotta go," then he hung up.

92. Around the same time, A. Valkenburg and/or Schnipke removed Orsburn's access to all Strategic Logix systems.

93. Orsburn retained an attorney, Jason Gordon, as counsel.

94. On October 20, 2025, Orsburn's counsel sent a notice and demand to the Valkenburgs and Schnipke to recognize Orsburn's 20% interest in Strategic Logix.

95. He received a response from Grace Tillman, an attorney with Oberman Law, who identified herself as counsel for both Strategic Logix and Schnipke.

96. Upon information and belief, Oberman Law's initial engagement letter identifies both Strategic Logix and Schnipke as clients.

97. Upon information and belief, Tillman is the attorney referenced in Schnipke's earlier Teams conversation with Orsburn.

98. Schnipke paid a $5,000 retainer for Oberman Law from a Strategic Logix bank account.

99. In their initial phone call, Tillman claimed that Orsburn did not have *any* ownership interest in Strategic Logix because every member was required to "earn" their membership interest.

100. Tillman added that, if Orsburn did not agree, then the members would simply "dissolve the company and start a new one."

101. The attempt at intimidation was so vacuous and unsupported that Tillman quickly abandoned it. Instead, she pivoted to veiled threats.

102. Tillman then offered that, while Orsburn was deployed, he "had time for extracurricular activities but he didn't have time to help run the company, and it would be unfortunate if people found out what he was doing instead."

103. This was a not-so-subtle threat that, unless Orsburn agreed to sell his interest for peanuts, Schnipke and/or A. Valkenburg would disclose personal, embarrassing information about Orsburn.

104. When that failed, Schnipke and A. Valkenburg embarked on a scheme to re-create Strategic Logix at another company—a continuation of its operations but without the need to reinstate Orsburn or fairly pay him for his membership interest.

***D. "Dissolve and Rebrand"***

105. In late October 2025, A. Valkenburg had a meeting with Hawke Media, a marketing agency. In the meeting, A. Valkenburg stated that he and his West Point partner had started a company and found themselves as the number one supplier of drones to the Department of War.

106. Also in late October 2025, A. Valkenburg had a meeting with Steven Shields at Odoo, a business management software company. In that meeting, A. Valkenburg told Shields that he was starting a new company and "rebranding" Strategic Logix. Later in the same meeting, A. Valkenburg stated that he was considering "dissolving and rebranding" and that could impact the timing, because

using Odoo would likely be a "multi-company decision" with businesses operating under a holding company.

107. Around the same timeframe and continuing for months, upon information and belief, A. Valkenburg told numerous other actual or potential suppliers, vendors, and customers that Strategic Logix was "rebranding" or going out of business.

### *E. Valkenburg Organizes Tandem Defense*

108. A. Valkenburg, with Schnipke's aid and encouragement, then set up the company to which the pair would move Strategic Logix's drone business.

109. On November 19, 2025, A. Valkenburg registered the domain www.tandemdefense.com.

110. On November 20, 2025, A. Valkenburg downloaded a complete copy of Strategic Logix's contact list and sales pipeline from HubSpot, a software service that Strategic Logix used to manage customer contact information, pending orders, sales, and sales opportunities.

111. On November 25, 2025, A. Valkenburg reserved the name "Tandem Defense" with the Georgia Secretary of State.

112. On or around December 15, 2025, A. Valkenburg met with a website design company called Jottful for a "build meeting" for Tandem Defense's website.

113. On December 18, 2025, A. Valkenburg organized Tandem Defense and registered with the Georgia Secretary of State.

114. On or around December 22, 2025, A. Valkenburg had another meeting with Jottful to review Tandem Defense's website and edits to Tandem Defense's products page.

115. Having successfully stood up the "rebranded" Strategic Logix through A. Valkenburg, Schnipke and A. Valkenburg then attempted to shut down Strategic Logix.

116. On December 18, 2025, Gordon and Orsburn received notice of a Company meeting. The meeting notice lists the following as membership interest percentages: (1) Schnipke at 75%; (2) Orsburn at 20%; and (3) N. Valkenburg at 5%.

117. Upon information and belief, N. Valkenburg reversed course on his planned exit from Strategic Logix to aid Schnipke and A. Valkenburg in their efforts to move Strategic Logix's operations to Tandem Defense.

118. The agenda was a transparent attempt to begin siphoning off the company's operations. The agenda items were:

- Approve A. Valkenburg's resignation from Strategic Logix, effective December 31, 2025.
- Consolidate decision-making authority for day-to-day operations in Schnipke.

- Grant A. Valkenburg a royalty-free, perpetual license to use all company intellectual property (while disclaiming that the company had any intellectual property) after leaving the Company.

- After freeing A. Valkenburg from his common-law duties as an employee, retain him as an independent contractor so he can retain access to Strategic Logix's operations and transfer them elsewhere, effectively causing Strategic Logix to pay for its executioner.

119. A. Valkenburg did not attend this meeting, but an attorney, Cary King, provided a letter claiming that A. Valkenburg was not a member and would not attend the meeting but, "to the extent Andrew Valkenburg is deemed a member", he waived his right to attend the meeting.

120. A. Valkenburg also provided a resignation letter dated December 19, 2025 where A. Valkenburg stated that he would resign from Strategic Logix effective December 31, 2025. He then disclosed a supposed agreement between the "parties" where he had a perpetual, royalty-free license to use the terms "RRSL" or "Rapid Reconfigurable Systems Line" and dictated the other terms of his separation.

121. All indications that the members were making any effort to keep Strategic Logix viable as a going concern vanished:

- Employees stopped loading any deal into HubSpot, the customer relationship management platform.

- Sales personnel were given no direction or excluded from customer conversations.

- Logged orders or opportunities began to mysteriously disappear from HubSpot.

- Incoming deposits almost entirely stopped, and the sales pipeline, which A. Valkenburg had valued at over $30 million before the PBAS award, is entirely absent from bank account records.

122. On their way out the door, A. Valkenburg and Schnipke awarded themselves and other employees retroactive pay and bonuses that lacked any legitimate business justification.

123. Upon information and belief, A. Valkenburg and/or Schnipke communicated their plans to Strategic Logix employees and coordinated employees to regroup at Tandem Defense or Powerus.

124. On January 20, 2026, another meeting was called to dissolve the company and wind down activity. The notice for that meeting also listed the ownership percentage according to the "initial membership distribution" as follows: (1) Jeremy Schnipke at 75%; (2) Addam Orsburn at 20%; (3) Neil Valkenburg at 5%.

125. The membership percentages listed in this notice and others are wrong because they omit A. Valkenburg's membership interest and incorrectly state that these allocations were made as part of an "initial membership distribution."

126. During that meeting, Tillman blamed Orsburn's deployment for why he had not been provided with information about the company's activities. Specifically, Tillman told Orsburn's attorney, "your client did not communicate with the company, and he didn't do what he was supposed to do, and he didn't participate, and he didn't care, and he, he did have time to engage in other extracurricular activities,

but he didn't have time for the company, so, uh, we would dispute that he was so busy that he couldn't do anything."

127. Tillman, on behalf of Schnipke, likewise linked Schnipke's and A. Valkenburg's actions to Orsburn's deployment in a December 29, 2025 email where she stated that Orsburn "abandoned the Company for months. He was supposed to provide services to the company during his deployment, which the Company and Mr. Orsburn had coordinated with Mr. Orsburn's commanding officer and obtained permission through a JAG's opinion."

128. Schnipke further confirmed that Orsburn's deployment motivated his actions in a position statement.

129. In that position statement, Schnipke characterized Orsburn's deployment as a "nine-month voluntary absence from Strategic Logix" where "during [Orsburn's] deployment," Orsburn "chose instead to be absent."

130. Schnipke listed Orsburn's deployment as a "period of authorized, voluntary non-participation" in Strategic Logix and that, based on Orsburn's "absence," Schnipke and A. Valkenburg did not "feel the current ownership arrangement [was] equitable . . . ."

131. Schnipke and A. Valkenburg paid themselves handsomely for destroying Strategic Logix. Schnipke set his salary as $100,000 and set A. Valkenburg's salary at $150,000, plus bonuses.

132. Shortly before A. Valkenburg's resignation, Schnipke increased his salary from $100,000 to $225,000 and authorized a year-end bonus to all employees, excluding Orsburn, of 15% of their annual compensation.

### *F. A. Valkenburg and Schnipke Have Their Cover Blown*

133. On or around March 9, 2026, a publicly traded shell company called Aureus Greenway Holdings Inc. (AGH) announced that it had entered into a definitive merger agreement with a company called Powerus. *See New American Drone and Defense Company to be Created Through Merger of Powerus and Aureus Greenway Holdings*, available at: https://www.nasdaq.com/press-release/new-american-drone-and-defense-company-be-created-through-merger-powerus-and-aureus (last accessed Mar. 26, 2026).

134. The press release also disclosed that one of Powerus's "wholly owned subsidiaries" is Tandem Defense LLC. On Powerus's website, A. Valkenburg is listed as the CEO of Tandem Defense. A. Valkenburg is also listed as a "founding team member" on Powerus's website.

135. Powerus was incorporated on October 8, 2025. Upon information and belief, A. Valkenburg and/or Schnipke had discussions with Powerus personnel or individuals affiliated with Powerus regarding an investment in Strategic Logix or the diversion of Strategic Logix's operations to Tandem Defense.

136. Tandem Defense makes almost no effort to hide that it is a clone of Strategic Logix's drone business. Before Tandem Defense extensively revised its website in or around June 26, 2026, Tandem Defense had lifted wholesale statistics, photographs, and information from Strategic Logix.

137. Tandem Defense's website contained an announcement dated November 2025 framing its low-cost, modular drone platform as a new offering "from the creator of the RRSL":




138. Tandem Defense's website listed metrics and pricing that matches Strategic Logix's. The starting price for Strategic Logix's and Tandem Defense's five-inch drone models are the same: $799.99.

139. Strategic Logix and Tandem Defense both listed the "cost per success" for their products at $841 with a success rate of 96%.

140. Strategic Logix touted that it created the first Blue UAS-certified fiber drone. Tandem Defense's website contained the same claim.

141. Tandem Defense used pictures of Strategic Logix drones on its website. Tandem Defense used a picture of an RRSL drone for the seven-inch drone quadcopter version of its drone offering as indicated by the photo's file name:




142. Tandem's business operations are fundamentally the same and, upon information and belief, its customers, suppliers, and contracts were largely transferred from Strategic Logix by Valkenburg and Schnipke.

143. Upon information and belief, Tandem initially used the same or similar facilities. It, like Strategic Logix, largely relies on suppliers, including L3Harris, Auterion, and Unusual Machines for drone parts and uses the same production methods to complete orders.

144. Tandem's work force is largely the same and supervised by A. Valkenburg and Schnipke.

145. Upon information and belief, the following Strategic Logix personnel are now employed by Tandem Defense and/or Powerus: (1) Jeremy Schnipke; (2) Andrew Valkenburg; (3) Brian Baswell; (4) Aaron Smith; and (5) Charlie Keebaugh.

146. Powerus and Tandem Defense rebranded Strategic Logix's RRSL drone platform as the Powerus/Tandem Defense Matrix platform. Both emphasize their: (1) scalability; (2) modularity; (3) ease of repair; (4) reusability; (5) low cost; and (6) an established and verified U.S.-based supplier network.

147. On its website, Tandem described two of its drones, the Matrix 5 and Matrix 10, as the "PBAS Tranche 1.1 Winner." Tandem did not exist at the time this selection was made, and Strategic Logix had this title, as publicly recognized by its supplier. *Unusual Machines Congratulates Customers Selected for the Army's PBAS Tranche 1.1, Including Envision Technology and Strategic Logix*, available at: https://www.charlotteobserver.com/press-releases/article313715772.html (last accessed Mar. 26, 2026).

148. Tandem Defense listed as a "recognition" that it had been selected as the PBAS Tranche 1.1 winner, a selection made before Tandem Defense was organized.

149. Another offering, the Matrix F, is identical to the RRSL Series F, a fiber optic drone that initially put Strategic Logix on the procurement map.

150. Tandem Defense listed on its website a drone called the VTRX. This drone has near-identical functionality and specifications as the VRTX, a drone sold by Strategic Logix.

151. On his LinkedIn page, A. Valkenburg described the RRSL as a "low-cost, U.S.-made drone ecosystem" and that, at Strategic Logix, he directed the "development and delivery of the [RRSL], advancing low-cost, modular drone capabilities."

152. At a May 2026 defense conference, Strategic Logix described its "headline product" as "the Rapid Reconfigurable Systems Line, a low-cost, US Made, Blue UAS, attack drone ecosystem with 4,330 configurations." Upon information and belief, nobody attended this May 2026 conference on behalf of Strategic Logix, and Defendants instead used this booth to market Tandem Defense/Powerus products.

153. On his LinkedIn page, A. Valkenburg likewise described the Matrix platform as a "low-cost U.S.-made attack drone platform."

154. Tandem Defense even pilfered Strategic Logix's slogan. Strategic Logix used the tagline, "War moves fast. We move faster" in its pitch deck. Tandem Defense uses the same tagline in public-facing materials, including its LinkedIn.

155. Upon information and belief, A. Valkenburg and Schnipke organized Tandem Defense, then transferred Strategic Logix's contracts, customer information, supplier information, to Tandem Defense under the guise of "rebranding" Strategic Logix.

156. A. Valkenburg repeatedly described Tandem Defense as the "rebranded" Strategic Logix from October 2025 until at least March 2026.

157. In March 2026, A. Valkenburg told Andrea Rodway, the Director of Capture for Auterion, a major drone software developer, that Strategic Logix had dissolved and rebranded to Tandem Defense. A. Valkenburg also told Rodway that he remained involved in completing certain orders for Strategic Logix.

158. After facilitating the transfer of Strategic Logix's business to Tandem Defense, Schnipke resigned from his role as the CEO of Strategic Logix in March 2026. Schnipke did not notify Orsburn that he was no longer acting as the CEO.

159. Schnipke then joined Tandem Defense as its Chief Operating Officer and received a significant amount of equity in Powerus, Tandem Defense's parent company.

160. Defendants took steps to hide Schnipke's involvement in Tandem Defense. In or around March 17, 2026, Schnipke's biography appeared on the Powerus "Leadership" page, but Powerus removed Schnipke from this page less than one day later.

161. Upon information and belief, A. Valkenburg and Schnipke sold their equity in Tandem Defense to Powerus,[2] thus removing Orsburn's right to receive fair

[2] Powerus has publicly described Tandem Defense as a "wholly owned subsidiary" of Powerus.

market value for his interest, and moved to a new entity to avoid their reinstatement obligations and obligation to not discriminate and retaliate against Orsburn under USERRA and to avoid paying Orsburn the fair market value of his membership interest.

***G. Defendants' Abuses of Corporate Separateness***

162. Tandem Defense and Powerus are alter egos who have abused the corporate form in order to defeat justice and to evade tort responsibility.

163. Tandem Defense and Powerus have disregarded the separateness of legal entities by commingling on an interchangeable or joint basis or confusing otherwise separate properties, records, and control such that even an executive-level employee cannot identify his job or employer.

164. Upon information and belief, Powerus assisted A. Valkenburg in creating Tandem Defense as a subterfuge for Powerus to acquire Strategic Logix's drone business, PBAS award, customers, and properties without paying the fair value for Orsburn's equity in Strategic Logix.

165. A. Valkenburg testified Tandem Defense was founded by multiple veterans from Powerus and those veterans work for Tandem Defense.

166. Powerus's website identifies A. Valkenburg as CEO of Tandem Defense and a member of Powerus's founding team.

167. Powerus also identifies its other founders as Brett Velicovich (Co-Founder, President & COO), Andrew Fox (Co-Founder, Chairman & CEO), and Ziv Marom (Co-Founder and CTO, as well as CEO of subsidiary Kaizen Aerospace).

168. Powerus co-founder Velicovich has identified himself as a veteran of special operations and combat deployments, like the Powerus veterans A. Valkenburg identified as also being founders of Tandem Defense.

169. Tandem Defense claims that Powerus acquired it for the payment of only $500 to A. Valkenburg on January 15, 2026, less than four weeks after Tandem Defense was organized under Georgia law. (*See, e.g.*, ECF No. 22 at 9, ECF No. 22-2 at 7.)

170. On or about March 4, 2026, A. Valkenburg appeared on NewsNation to discuss drones. NewsNation introduced A. Valkenburg as "the owner of the drone company Strategic Logix" and the host then asked A. Valkenburg if he had "miss[ed] anything[?]" In response to that question, A. Valkenburg neither denied his ownership of Strategic Logix nor identified anything the host missed identifying him as the owner of the drone company Strategic Logix.

171. During the NewsNation interview, NewsNation and A. Valkenburg showed the Tandem Defense Matrix drone, the drone taken from Strategic Logix. A. Valkenburg identified the Matrix drone as Tandem Defense's "flagship product."

And A. Valkenburg identified Tandem Defense as "our new drone company under Powerus."

172. In or around March 2026, Powerus founder and Tandem Defense executive A. Valkenburg communicated to another drone industry company that Strategic Logix had dissolved and rebranded to Tandem Defense.

173. Since Orsburn filed this lawsuit on March 26, 2026 [ECF No. 1] and his emergency motion for preliminary injunction on April 30, 206 [ECF No. 9], Powerus has accelerated a campaign of subjugating Tandem Defense, confusing and commingling it and its drone products with Powerus, moving Tandem Defense's products and executives to Powerus, and eviscerating Tandem Defense to defeat justice, evade tort liability, commingle and confuse property and control, and render Tandem Defense with insufficient assets to satisfy Orsburn's claims.

## IV. POST-FILING FACTUAL DEVELOPMENTS

174. Powerus, at some point after Orsburn filed his Complaint, moved or added Tandem Defense employees as Powerus employees.

175. During the preliminary injunction hearing, Schnipke testified that he had various "formal" and "informal titles at both Tandem Defense and Powerus, and those titles and roles were in flux due to organizational changes.

176. Schnipke's titles, at various points, included COO of Tandem Defense, Executive Vice President of Operations for Powerus, then Director of R&D for Powerus.

177. Schnipke could not clearly explain if he had an employment agreement with Powerus, Tandem Defense, or both, but he agreed that he worked for both companies. Schnipke expressed confusion about whether his roles, work, and employment agreement was with Tandem Defense or Powerus.

178. Prior to Orsburn's filing his Complaint, A. Valkenburg listed his title on LinkedIn as the Chief Executive Officer of Tandem Defense beginning in March 2026.

179. By June 2026, A. Valkenburg backdated his LinkedIn to change his start date with Tandem Defense to January 2026 and added a position as the Executive Vice President of Powerus beginning in January 2026.

180. In their executive roles at Powerus, Schnipke and A. Valkenburg continued to work from their homes in Georgia, as they did for Tandem Defense and Strategic Logix.

181. During the preliminary injunction hearing, A. Valkenburg testified that he signed an employment agreement with Tandem Defense and an employment agreement with Powerus around January 19, 2026.

182. Powerus also began conflating its actions and those of Tandem Defense in its public communications and otherwise took affirmative efforts to erase Tandem Defense and instead referencing Powerus as if it was the same company with the same properties as Tandem Defense.

183. In social media posts on x.com by Powerus prior to April 2026, Powerus included a hashtag for Tandem Defense (#TandemDefense) or a direct tag (@TandemDefense) in posts related to Tandem Defense's offerings.

184. After Orsburn filed this lawsuit, Powerus edited its prior social media posts to remove references to Tandem Defense.

185. Powerus also rebranded Tandem Defense drone offerings. Early posts and press releases referred to drones by "Tandem Defense, a Powerus company" or similar language. After Orsburn filed this lawsuit, however, Powerus began referring to Tandem Defense drones as *Powerus* drones.

186. Since the motion for preliminary injunction was filed on April 30, 2026, Powerus almost entirely stopped referring to Tandem Defense in social media posts and press releases. Powerus also began referring to the "Tandem Defense Matrix" system as the "Powerus Matrix" system, as evidenced in the following:

a. April 9, 2026 Powerus Facebook post refers to "Tandem Defense's Matrix system" for drones. https://www.facebook.com/watch/?v=930880293040210 (accessed June 4, 2026).

b. April 15, 2026 press release refers to the "Powerus' Tandem Defense Matrix-T." https://www.globenewswire.com/news-release/2026/04/15/3274442/0/en/U-S-Army-Best-Ranger-Competition-Integrates-Live-Drone-Threats-in-Historic-First-Selects-Powerus-Tandem-Defense-Matrix-T-for-Targets.html?_gl=1*1fe3r7w*_up*MQ..*_ga*MjA2Njg1NTkxLjE3NzYyNTk1NDI.*_ga_B6167QB2TF*czE3NzYyNTk1NDEkbzEkZzAkdDE3NzYyNTk1NDEkajYwJGwwJGgw*_ga_ERWPGTJ5X8*czE3NzYyNTk1NDEkbzEkZzAkdDE3NzYyNTk1NDEkajYwJGwwJGgw (accessed June 4, 2026).

c. April 22, 2026 post refers to the selection of the "Powerus' Tandem Defense Matrix-T" drone by the U.S. Army. https://www.defenseandmunitions.com/news/us-army-best-ranger-competition-integrates-live-drone-threats-selects-powerus-tandem-defense-matrix-t-targets/ (accessed June 4, 2026).

d. Powerus previously tagged or referred to Tandem Defense on Twitter/X posts, but those posts appear to have since been modified to remove references to Tandem Defense.

e. May 27, 2026 article refers to the "Powerus Matrix" series drones. https://finance.yahoo.com/markets/stocks/articles/powerus-selected-compete-phase-ii-123000236.html (accessed June 4, 2026).

f. June 3, 2026 Twitter/X post by Powerus founder refers to "Powerus Matrix Series" drones. https://x.com/TheDroneWarrior/status/2062168515029631130?s=20 (accessed June 4, 2026). A screenshot of this post is included below:




187. Consistent with its social media strategy, Powerus also began entering drone competitions and exhibitions under the name "Powerus" rather than Tandem Defense, as it had done previously.

188. On May 27, 2026, Powerus announced that Powerus had been selected for Phase II of the Pentagon's "Drone Dominance" initiative. A. Valkenburg, now identified as the Executive Vice President of Technology and Manufacturing at Powerus, stated that the "MatrixFold platform" is "built on the same Matrix architecture" used in other offerings, thus revealing "MatrixFold" as a synonym for the Matrix architecture used by Tandem Defense.

189. Powerus likewise touts the MatrixFold drones for their ease of repair, modularity, U.S.-based sourcing, Blue UAS-compatibility, and NDAA compliance.

190. On June 30, 2026, an Indian defense company called Paras Defense and Space Technologies announced that it had signed an intellectual property licensing agreement with Tandem Defense LLC, which the company then defined in the press release as Powerus.

191. In Tandem Defense's closing argument, Tandem Defense's counsel confirmed that Tandem Defense's "ultimate leader" is Andrew Fox, the founder and CEO of Powerus. Fox is not publicly identified as holding any position at Tandem Defense.

192. Powerus moved Tandem Defense's drone products, drone business, customers, employees, and competition for U.S. military contracts to then non-defendant Powerus to deprive Orsburn of corporate assets at Defendant Tandem Defense against which Orsburn could collect a judgment for his tort claims.

193. Given Tandem Defense's founding as a cut-out of Strategic Logix in late 2025, its January 2026 acquisition by Powerus, its short lifespan as a drone business before Powerus shifted its products and executives to itself in April-May 2026, and Powerus's ongoing efforts to evade Tandem Defense's tort liability, it is highly unlikely that Tandem Defense has or will have sufficient corporate assets to satisfy Plaintiff Orsburn's claims.

194. For example, Orsburn's state law claim seeks inter alia the fair value of his 20% member interest in Strategic Logix which Defendants appropriated for

themselves and de-valued through breaches of fiduciary duty, aiding and abetting such breaches, and civil conspiracy, in addition to punitive damages and attorneys' fees.

195. If Orsburn should prevail on his state-law claims, Orsburn stands to recover between $12 million up to $352 million or more for that claim alone.

196. As of mid-July 2026, the current market capitalization for PUSA, which functions as a rough proxy for Powerus's value, is approximately $80 million.

197. It is highly unlikely that Tandem Defense has or will have sufficient corporate assets to satisfy Orsburn's claims should he prevail.

198. Powerus took the above actions in bad faith, as a coverup, and as a subterfuge to avoid Tandem Defense's tort liability to Orsburn for its conduct—and those of its executives and co-conspirators—in appropriating for itself the value of Orsburn's equity in Strategic Logix. In the circumstances of this case and Powerus's conduct, it would defeat justice to permit Powerus to use the corporate form to avoid liability for Tandem Defense's conduct.

***A. Defendants Create a Fake Job for Orsburn***

199. In an effort to avoid Orsburn's motion for preliminary injunction, Defendants Schnipke, A. Valkenburg, Tandem Defense, and Powerus created a fake job for Orsburn.

200. On May 19, 2026, Orsburn received a letter from Judith "Rene" McKay, a bookkeeper hired by Strategic Logix in January 2026, purportedly offering him employment as the Director of Business Development for Strategic Logix at a salary of $215,000 per year.

201. Schnipke authorized the job offer, but the offer was not his idea. Schnipke testified that an attorney whose name he did not recall had the idea.

202. Schnipke knows the names of the attorneys who represent him. Upon information and belief, an attorney representing Tandem Defense caused Schnipke to offer employment to Orsburn.

203. The job offer was conditioned on Orsburn's completing drug testing and a background check.

204. The job offer also came with a ***one-day*** window to accept it. McKay claimed that there were urgent customer messages that needed to be triaged.

205. In reality, Strategic Logix had no ongoing business operations. As Tillman stated in January 2026, Strategic Logix had "lost all of its employees" and had "no business going forward" because the company did not have "employees or the people" to continue the company's business.

206. Tillman also stated that the company had "no new business that is coming into" Strategic Logix. Tillman indicated that, if Orsburn or his counsel had

a proposal for what the company should do going forward, they could propose it and it would be considered by the members.

207. Orsburn nonetheless accepted the offer so that he could provide for his family.

208. Orsburn attempted to understand what, if any, operations Strategic Logix had, but Schnipke and A. Valkenburg had no interest in providing Orsburn with a position at Strategic Logix other than as a litigation tactic.

209. That soon became apparent as Orsburn tried to address the supposedly urgent customer inquiries that warranted such a short fuse on the reinstatement offer. Instead:

- McKay refused to provide Orsburn with access to any internal company resources until he completed onboarding.
- McKay refused to have a phone call with Orsburn. She instead insistent that he send any questions by email.
- McKay refused to provide Orsburn with access to his company email and instead told Orsburn to use a Gmail account.
- McKay did not initially provide Orsburn with any information regarding the "customer inquiries" referenced in the offer he received.

210. Upon information and belief, Schnipke or someone acting at his direction attempted to remove Orsburn's access to historical information, including Teams messages and HubSpot activity.

211. Since rejoining Strategic Logix, Orsburn has contacted numerous customers and suppliers who previously worked with Strategic Logix. Those

companies and individuals largely expressed confusion about why anyone from Strategic Logix was contacting them, because they were told that Strategic Logix had dissolved or was shutting down.

212. Some customers migrated to Tandem Defense. One customer, Staff Sergeant Lorenzo McBean, a member of the Third Infantry Division, called Orsburn to ask about renewing the division's Starlink services through Strategic Logix.

213. During the call, he told Orsburn, "I know y'all have transitioned to the new company for our other stuff, but we want to keep the Starlink" subscription Strategic Logix managed.

214. Orsburn directed McBean to contact McKay because he did not have access to any resources to renew the subscription. McBean contacted McKay, and she responded to this customer request by telling him that their account was terminated.

215. McKay did not tell Orsburn that McBean had contacted her or she terminated this customer account in response to that outreach.

216. Upon information and belief, McKay has no purpose at Strategic Logix other than to receive messages from Orsburn, then convey them to Schnipke, who then conveys the request to his attorneys or attorneys for Tandem Defense.

217. And, while Schnipke continues to claim that Strategic Logix is "operational," he has allowed Strategic Logix's website to go offline and for core software licenses, such as Microsoft Teams, to expire.

### *B. A. Valkenburg and Schnipke Offer an Absurd Explanation for Their Actions*

218. Orsburn filed a motion for preliminary injunction against Schnipke, Valkenburg, and Tandem Defense. A. Valkenburg and Schnipke testified under oath to a series of events that is comprehensively contradicted by their own prior statements and mountains of contemporaneous documents.

219. A. Valkenburg and Schnipke claimed that A. Valkenburg was an "intern" for Strategic Logix. His "internship" as the COO of Strategic Logix included meetings with high-level military personnel and members of Congress, the creation of Strategic Logix's flagship product, and investment discussions ranging from $40 million to hundreds of millions of dollars.

220. A. Valkenburg conceded that, during 2025, he routinely represented himself as an owner or partner in Strategic Logix while disclaiming that he actually was. A. Valkenburg claimed that Schnipke chastised him for doing so but failed to present any contemporaneous documents to support this claim.

221. Schnipke testified that he would allow Orsburn to return to his role at Strategic Logix if he gave up his equity and instead accepted stock options based on future performance. Schnipke could not explain why he offered stock options to

Orsburn when Strategic Logix did not have stock. Schnipke also could not explain why A. Valkenburg would pay for a portion of Orsburn's equity in Strategic Logix.

222. A. Valkenburg and Schnipke, dissatisfied with their discussions with Orsburn, claim they decided to walk away from tens or hundreds of millions of dollars and wind down Strategic Logix rather than work with Orsburn.

223. Months later, Schnipke admitted that lawyers directed him to re-hire Orsburn at Strategic Logix. Schnipke could not recall which lawyer suggested the idea, nor can he explain why he agreed to reinstate Orsburn beyond his unflagging support of veterans and desire to prevent homelessness among veterans.

224. Schnipke and A. Valkenburg attempted to distance Tandem Defense and Powerus from Strategic Logix by claiming their businesses were different. A. Valkenburg testified that Strategic Logix was not a drone company.

225. That testimony is contradicted by Strategic Logix's investor presentation materials, its operations and sales, and how A. Valkenburg described the company to vendors, suppliers, and investors.

### *C. Orsburn's Basis for Direct Claims*

226. Schnipke, A. Valkenburg, and N. Valkenburg contend that there are three members of Strategic Logix: (1) Schnipke; (2) Orsburn; (3) N. Valkenburg.

227. After regularly representing that he was a member of Strategic Logix, A. Valkenburg now denies that he is a member of Strategic Logix.

228. No member of Strategic Logix other than Orsburn has or intends to file a lawsuit asserting the claims raised in the Amended Complaint.

229. All members of Strategic Logix, other than Orsburn, are defendants in this lawsuit.

230. N. Valkenburg has directly expressed that he does not join or support any action by Strategic Logix against Schnipke and A. Valkenburg.

231. A direct action by Orsburn poses no risk to creditors of the company. Strategic Logix has almost entirely ceased operations and has minimal ongoing expenses other than compensation for Orsburn and McKay.

232. Strategic Logix's financial records, including its general ledger, do not include any material liabilities to any creditor. Strategic Logix has roughly $830,000 in cash.

233. Any recovery will not prejudice other shareholders. Orsburn claims that Schnipke, A. Valkenburg, and N. Valkenburg attempted to squeeze out Orsburn and, when that failed, transferred Strategic Logix's drone business to a new company, Tandem Defense and diverted customers, suppliers, and vendors to Tandem Defense/Powerus.

234. Orsburn's claims seek redress for harm that is specific to him and not generally shared by the other members of Strategic Logix.

235. Orsburn's claims do not prevent adequate compensation to injured shareholders because Schnipke, A. Valkenburg, and N. Valkenburg separately financially benefited or were promised a financial benefit for their improper actions.

**COUNT I**
**38 U.S.C. § 4311 (USERRA Discrimination and Retaliation)**
**Against Schnipke, A. Valkenburg, Tandem Defense, and Powerus**

236. Orsburn incorporates by reference Paragraph Nos. 1-225 of his Amended Complaint.

237. Tandem Defense is an "employer" within the meaning of USERRA because it is a successor in interest to Strategic Logix, LLC, a USERRA employer, and because it employs employees. 38 U.S.C. § 4303(4)(A), (D).

238. Powerus is an "employer" within the meaning of USERRA because it is a successor in interest to Strategic Logix, LLC, a USERRA employer, and because it employs employees. 38 U.S.C. § 4303(4)(A), (D).

239. Schnipke is an "employer" within the meaning of USERRA because he is a person to whom Strategic Logix and/or Tandem has delegated the performance of employment-related responsibilities, who denied employment to Orsburn, and who authorized an offer of employment to Orsburn.

240. Valkenburg is an "employer" within the meaning of USERRA because he is a person to whom Strategic Logix and/or Tandem has delegated the performance of employment-related responsibilities, who denied employment to

Orsburn, and who had control over employment opportunities during his employment at Strategic Logix.

241. Orsburn is an "employee" within the meaning of USERRA. 38 U.S.C. § 4303(3).

242. Orsburn participated in "service in the uniformed services" under USERRA beginning in January 2025.

243. Orsburn made applications for reinstatement directly and through his counsel within 90 days of the conclusion of his service in the uniformed services.

244. Defendants refused to reinstate Orsburn.

245. In October 2025, Schnipke and Valkenburg discriminated and retaliated against Orsburn by refusing to reinstate him and/or to continue his employment, denying Orsburn initial employment, denying him benefits of employment, including salary and benefits, removing his access to Strategic Logix systems, attempting to cancel his 20% membership interest, and exfiltrating assets from Strategic Logix to continue the business through a new entity to avoid compensating Orsburn for his membership interest and to avoid reinstating him.

246. As part of their discrimination and retaliation against Orsburn, Schnipke and Valkenburg coordinated the transfer of Strategic Logix's internal information, business operations, customers, pending orders, government contracts,

supplier contracts, and all other essential assets from Strategic Logix to Tandem Defense.

247. Tandem Defense is a successor in interest under USERRA because the company is continuing Strategic Logix's business operations by making the same orders to the same customers using the same suppliers that were used by Strategic Logix led by two of the founders of Strategic Logix.

248. Both companies have a continuity of workforces because Schnipke and Valkenburg controlled both companies.

249. There is no material difference in the jobs and working conditions at both companies.

250. The supervisory personnel are the same or substantially similar at both companies.

251. The production methods at both companies are the same or substantially similar.

252. The products or services offered by both companies are the same or substantially similar.

253. In May 2026, Defendants discriminated and retaliated against Orsburn by offering him a fake job at Strategic Logix, which Tandem Defense's lawyer admitted was a "remedial measure," and conditioning his return to Strategic Logix on his satisfactory completion of a drug test and background check.

254. Upon information and belief, Tandem Defense and/or Powerus caused Orsburn to receive a position at Strategic Logix.

255. Beginning in June 2026, Defendants also discriminated and retaliated against Orsburn by reinstating him to employment at Strategic Logix while limiting his access to historical data and key resources and otherwise preventing any meaningful reinstatement to a position of equivalent status, duties, and opportunity.

256. Powerus is also a successor in interest. Powerus, the parent company of Tandem Defense, began assimilating Tandem defense's personnel and operations to limit potential exposure from an adverse judgment against Tandem Defense, as evidenced by: (1) new Powerus titles for Tandem Defense personnel; (2) rebranding Tandem Defense products as Powerus products; and (3) removing references to Tandem Defense in public materials about Powerus.

257. Upon information and belief, a Powerus employee, Andrew Fox, has ultimate control over Tandem Defense's operations and activities.

258. Orsburn's service in the uniformed services and/or his assertion of his rights under USERRA was a motivating factor for Defendants' actions.

259. Defendants' actions were willful and intentional violations of USERRA and entitle him to liquidated damages.

260. Defendants' actions harmed Orsburn by depriving him of wages and benefits, past wages and bonuses, as well as the value of his interest in Strategic Logix.

261. Orsburn seeks to compel Defendants to comply with USERRA, compensate him for lost wages and benefits, award him liquidated damages, and award him interest. 38 U.S.C. § 4323(d).

262. Orsburn also seeks to recover his reasonable attorneys' fees and costs pursuant to 38 U.S.C. § 4323(h).

**COUNT II**
**38 U.S.C. §§ 4312, 4323 (USERRA Reinstatement and Equitable Relief) Against Schnipke, A. Valkenburg, Tandem Defense, and Powerus**

263. Orsburn incorporates by reference Paragraph Nos. 1-225 and 237-258 of his Amended Complaint.

264. Orsburn is entitled to reemployment with Tandem Defense or Powerus as a successor in interest to Strategic Logix.

265. Defendants are subjecting Orsburn to ongoing USERRA violations by continuing to discriminate and retaliate against him.

266. Orsburn made timely demands to continue employment at Strategic Logix and Tandem prior to filing this lawsuit.

267. Defendants initially refused to reinstate Orsburn and have now refused to reinstate Orsburn at Tandem Defense or at Powerus.

268. Orsburn has complied with all requirements for continued employment.

269. Defendants' actions have deprived Orsburn of the value of his membership interest in Strategic Logix.

270. An injunction is proper under the Court's equitable power because Orsburn is being subjected to ongoing violations of USERRA, the harm to Orsburn outweighs the injury to Defendants, Orsburn is likely to success on the merits of his claims, and awarding this relief is in the public interest.

271. The Court should enter preliminary and permanent injunctive relief finding Tandem Defense and Powerus to be successors in interest to Strategic Logix, restoring Orsburn to his position at Powerus or Tandem Defense, transferring Orsburn 20% of Tandem Defense or 20% of the proceeds from any transaction to acquire Tandem Defense's equity, enjoining Defendants from retaliating against Orsburn for his exercise of his rights under USERRA, and any other preliminary or permanent injunctive relief the Court deems appropriate.

272. Orsburn also seeks to recover his reasonable attorneys' fees and costs pursuant to 38 U.S.C. § 4323(h).

## COUNT III
**Breach of Fiduciary Duty**
**Against Schnipke, Andrew Valkenburg, and Neil Valkenburg**

273. Orsburn incorporates by reference Paragraph Nos. 1 to 235 of his Amended Complaint.

***Existence of Fiduciary Duties***

274. Defendants Jeremy Schnipke, Andrew Valkenburg, and Neil Valkenburg each owe fiduciary duties to Plaintiff Addam Orsburn.

275. Strategic Logix is a Georgia LLC, but has no executed Operating Agreement.

276. The Articles of Organization of Strategic Logix, LLC, filed with the Georgia Secretary of State on September 10, 2024, do not vest management of the LLC in a Manager or Managers.

277. Pursuant to O.C.G.A. 14-11-304(a), because neither the articles of organization nor a written operating agreement vests management in one or more managers, Strategic Logix is a member-managed limited liability company.

278. As a result of the foregoing, members managing the business and affairs of the company owe fiduciary duties to the other members of the company.

279. While Orsburn was deployed, a control group of Jeremy Schnipke, A. Valkenburg and N. Valkenburg, together, held a majority interest in Strategic Logix and directed its business and affairs.

280. Schnipke, A. Valkenburg and Neil Valkenburg managed the business and affairs of Strategic Logix in the following ways, among others:

a. Schnipke was involved in the day-to-day management of the business and affairs of Strategic Logix.

b. Schnipke testified in this Court that he is a Managing Member of Strategic Logix. (Schnipke Decl. ¶ 3, ECF No. 22-1.) While that statement is incorrect as a matter of Georgia law, it reveals his involvement in the business and affairs of Strategic Logix generally.

c. In addition, Schnipke was the CEO of Strategic Logix from its formation until March 2026. As an officer of the LLC, he owes fiduciary duties to its members.

d. A. Valkenburg was involved in the day-to-day management of the business and affairs of Strategic Logix.

e. A. Valkenburg actively managed the operations and activities of the company.

f. A. Valkenburg started Strategic Logix in 2024 and from the very beginning, orchestrated the company's operations.

g. As one example of his management role in Strategic Logix, it was A. Valkenburg who modified Orsburn's compensation to remove the commission component, increase his membership interest from 5% to 20%, and gave Orsburn the title of Director of Business Development.

h. In addition, A. Valkenburg held himself out as an officer (COO) of Strategic Logix. As an officer of the LLC, he owes fiduciary duties to its members.

i. A. Valkenburg represented himself to be an "owner" of Strategic Logix or a "partner" in Strategic Logix to third parties and the news media;

j. N. Valkenburg was involved in the business and affairs of Strategic Logix as its CFO and was personally involved in the relevant Strategic Logix transactions described in the Amended Complaint.

k. In addition, N. Valkenburg held himself out as an officer (CFO) of Strategic Logix. As an officer of the LLC, he owes fiduciary duties to its members.

281. In the alternative, If A. Valkenburg were held not to be a member in Strategic Logix, he would still owe fiduciary duties to Orsburn in fulfilling his role as COO of Strategic Logix.

282. Orsburn is a member of Strategic Logix to whom Schnipke, Valkenburg, and N. Valkenburg owe fiduciary duties.

***Fiduciary Duties Owed to Orsburn***

283. Among the fiduciary duties owed by Schnipke, A. Valkenburg and N. Valkenburg to Orsburn are the duties of the good faith and the duty of loyalty.

284. The duty of good faith requires the utmost good faith in managing the LLC.

285. Good faith requires that all members of an LLC be treated fairly and their investments protected.

286. The duty of good faith prohibits a fiduciary from appropriating for himself the assets and property of the company, to the exclusion of minority members.

287. The duty of good faith thus imposes a duty on Schnipke, A. Valkenburg and N. Valkenburg, owed to Orsburn, not to improperly appropriate Strategic Logix's value as a going concern and corporate opportunities.

288. Because Strategic Logix has no signed, written operating agreement, there are no restrictions or reductions to the fiduciary duties imposed by Georgia law on Schnipke, Valkenburg, and Neil Valkenburg.

289. Further, under Georgia law, even if there were an executed, written operating agreement, liability may not be limited for intentional misconduct or for any transaction for which a defendant received a personal benefit.

290. The duty of loyalty requires the finest loyalty to those the fiduciary serves, in this case Orsburn, and prohibits self-dealing, the appropriation of business opportunities, and competition against the company.

291. The duty of loyalty, among other things, precludes acquisition by officers or former officers of the property of a business opportunity in which the company has a beachhead in the sense of a legal or equitable interest or expectancy growing out of a preexisting right or relationship.

292. Once it has been established that a corporate opportunity has been presented to an officer, he must prove that he did not violate his fiduciary duties of loyalty, good faith, and fair dealing toward the corporation.

293. Schnipke, A. Valkenburg, and N. Valkenburg also owe a fiduciary duty of loyalty to Strategic Logix by virtue of their employment with Strategic Logix and their status as agents of Strategic Logix.

294. Under Georgia law, an agent breaches a duty of loyalty owed to his employer by using his position for his own personal benefit to the detriment of his employer.

***Breach of Fiduciary Duties***

295. Schnipke, A. Valkenburg, and N. Valkenburg breached the duty of utmost good faith by:

a. Failing to act with the utmost good faith and fairly treat Orsburn when they opted not to pursue and/or consummate potential sales or investments in Strategic Logix.

i. Strategic Logix enjoyed early success, which was reflected in valuations related to Orsburn by A. Valkenburg and by offers received by Schnipke and/or A. Valkenburg.

ii. On December 30, 2024, A. Valkenburg told Orsburn and Schnipke that Strategic Logix was worth $20 million in a "worst case scenario," and $47 million in a "best case scenario."

iii. On May 17, 2025, A. Valkenburg told Orsburn that he had "an offer for $40M for 10% and I'm considering taking it but we need to create 10% so I have a proposal."

iv. On June 6, 2025, A. Valkenburg relayed to Orsburn that a potential investor had floated an offer of $250 million for 75% of Strategic Logix.

v. Orsburn understood that A. Valkenburg and Schnipke had paused discussions with investors pending the Army Purpose-Built Attributable System ("PBAS") award as that would have a significant positive effect on the company's valuation; if awarded, it would allow Strategic Logix the ability to market some of its drones as "program of record" selections – tantamount to the Army's seal of approval and a potent qualification to highlight in bids for contracts.

vi. Strategic Logix received the PBAS award in September 2025.

vii. In September 2025, A. Valkenburg informed Orsburn that Strategic Logix received an offer to purchase the company for $60 to $70 million plus stock in the new company and employment contracts.

viii. By October, 2025, Schnipke and A. Valkenburg had decided that Orsburn's 20% interest was not "equitable" and informed Orsburn that they intended to buy his interest –not for the value of the interest, but instead, at an amount that Schnipke and Orsburn felt reflected Orsburn's contribution to the company.

ix. Orsburn refused to be forced out for a fraction of what his interest was truly worth.

x. Rather than negotiate for the sale of the company for favorable terms for the benefit of all members, Orsburn, A. Valkenburg and N. Valkenburg embarked on a plan to divert Strategic Logix's assets, intellectual property and business to a new company, Tandem Defense, so they could exclude Orsburn from the proceeds of a sale.

b. Failing to act with the utmost good faith and fairly treat Orsburn when they took action to exclude Orsburn from Strategic Logix and attempted force him to surrender his ownership in the company.

i. After receiving a lucrative offer to purchase Strategic Logix, Schnipke and A. Valkenburg attempted to coerce Orsburn to relinquish his 20% interest in Strategic Logix;

ii. Schnipke and A. Valkenburg told Orsburn that N. Valkenburg had "given back" his interest in Strategic Logix because he did not believe he had done enough work for the Company to justify his 5% interest. In doing so, N. Valkenburg either asked for or was promised future consideration from his brother, Andrew Valkenburg, and/or Schnipke when they "get rich."

iii. Schnipke and Valkenburg demanded a "clean buyout" of Orsburn's interest, which Schnipke described to Orsburn as his sole "path forward."

iv. But Schnipke and Valkenburg did not offer anything close to the true value of Orsburn's interest in the company.

v. When Orsburn resisted the efforts to seize his ownership interest, Schnipke and Valkenburg removed Orsburn's access to Strategic Logix systems and refused to reinstate him as an employee upon his return from deployment;

vi. Schnipke revealed that he had an attorney helping with the "process" of removing Orsburn from Strategic Logix;

vii. That counsel stated that she represented Schnipke and Strategic Logix and advised Orsburn's counsel that if Orsburn did not agree to give up his ownership interest, the members would simply dissolve Strategic Logix and start a new company without Orsburn.

viii. After purportedly walking away from an interest worth millions or tens of millions of dollars because he had not done enough work for the company, N. Valkenburg reemerged to attend governance meetings and vote as directed by Schnipke to prevent a deadlock between Schnipke and Orsburn.

ix. As described in the Amended Complaint, Schnipke, Valkenburg, and N. Valkenburg attempted to execute that plan, with Valkenburg establishing a new, competitor, Tandem Defense, and Schnipke and N. Valkenburg facilitated and encouraged Valkenburg to raid Strategic Logix and take with him any confidential information, customer information, and intellectual property he desired.

c. Failing to act with the utmost good faith and fairly treat Orsburn when they furtively acted to facilitate and move Strategic Logix's business pipeline, assets and intellectual property to a new, competing business to exclude Orsburn;

i. Schnipke, A. Valkenburg, and N. Valkenburg exerted control over the business and affairs of Strategic Logix, attempted to immunize A. Valkenburg of his fiduciary duties by creating a false paper trail suggesting that A. Valkenburg was never a member of Strategic Logix. They later claimed that A. Valkenburg was merely an intern;

ii. In November 2025, A. Valkenburg downloaded the full customer list and deals report from Strategic Logix's customer relationship management system.

iii. A. Valkenburg, while still employed by Strategic Logix, set up a competing company, Tandem Defense. As discussed in more detail herein, the business and assets of Strategic Logix were diverted to Tandem Defense from which Orsburn was excluded.

iv. A. Valkenburg sent a "resignation" letter to Schnipke and his attorney on or about December 19, 2025. In that letter, A. Valkenburg resigned, effective December 31, 2025, from his position of Chief Operating Officer, but he stated he would be willing to continue as an independent contractor subject to certain conditions, which included an agreement that he is not bound by any non-competition or other restrictions.

v. Schnipke and N. Valkenburg then took actions in managing the business and affairs of Strategic Logix specifically designed to allow A. Valkenburg to leave Strategic Logix and take with him whatever confidential information and intellectual property he desired;

vi. At a December 29, 2025 Meeting of the Members of Strategic Logix, LLC, Schnipke and N. Valkenburg purported to accept A. Valkenburg's resignation from his responsibilities as an officer of Strategic Logix;

vii. Schnipke and N. Valkenburg caused Strategic Logix to retain A. Valkenburg as an "independent contractor," which allowed A. Valkenburg to have continued access to Strategic Logix's information system and operations;

viii. Schnipke and N. Valkenburg also caused Strategic Logix purportedly to grant A. Valkenburg a royalty-free, perpetual license to use all Strategic Logix intellectual property. This license would continue even after A. Valkenburg left Strategic Logix.

ix. On or around January 9, 2026, A. Valkenburg resigned from his independent contractor role. By March, 2026, Tandem

Defense had hired Schnipke as its COO. Strategic Logix was left as an empty shell.

d. Failing to act with the utmost good faith and fairly treat Orsburn when they allowed and engaged in activity in direct competition to Strategic Logix through the diversion of customers, sales, suppliers, and employees from Strategic Logix to Tandem Defense.

i. Beginning in October 2025 through at least March 2026, Andrew Valkenburg told third parties that Strategic Logix was rebranding, changing its name, dissolving, and/or restructuring as part of multiple companies.

ii. The domain "Tandemdefense.com" was registered by someone in Georgia on November 19, 2025.

iii. The next day, A. Valkenburg downloaded the full customer list and deals report from Strategic Logix's customer relationship management system.

iv. The Tandem Defense website (at Tandemdefense.com) then used Strategic Logix's business, drones, photo, awards, and specifications.

v. That website described two of its drones, the Matrix 5 and Matrix 10 as the "PBAS Tranche 1.1 Winner." But Tandem Defense

did not exist at the time this PBAS (Army Purpose-Built Attributable System) award was won. Instead, Strategic Logix had this title, as publicly recognized by its Supplier. Further, the Matrix F offered by Tandem Defense is identical to the RRSL Series F offered by Strategic Logix. Like Strategic Logix before it, Tandem Defense describes this drone as the "first US-made fiber optic FPV drone."

vi. The Tandem Defense website also lists pricing and specs for Tandem Defense drones taken from Strategic Logix's drones; and identifies other drone and business characteristics taken from Strategic Logix.

vii. Tandem Defense's website also uses Strategic Logix's branding, such as "Nothing Great Is Built Alone." And Tandem Defense's website lists November 2025 News using Strategic Logix's drone: "From the Creator of RRSL: Tandem Defense Debuts M3 Multi-Mission Matrix," then identifying the "CEO of Tandem Defense" (Andrew Valkenburg).

viii. In November 2025, Tandem debuted its "Matrix" platform and presented it as "from the creator of [Strategic Logix's] RRSL" platform.

ix. Shortly thereafter, the rate at which deals were loaded onto Strategic Logix's customer relationship management system declined precipitously, logged orders or opportunities began to mysteriously disappear from the system, and incoming deposits almost entirely stopped.

x. The Strategic Logix sales pipeline, which A. Valkenburg had previously estimated to be over $30 million, vanished.

xi. For instance, in 2025, Valkenburg diverted deals and leads from Strategic Logix, such as National Guard leads involving Adam Earhart and a $2.5 million order involving Adam Earhart. These and other leads and invoices disappeared from Strategic Logix in late 2025 and into 2026.

xii. Despite this precipitous decline, Schnipke and N. Valkenburg took no action to stop the raiding of Strategic Logix and instead continued to facilitate the migration of work to Tandem Defense.

xiii. A. Valkenburg organized Tandem Defense by December 18, 2025. He sent his letter resigning as COO of Strategic Logix the next day.

xiv. A. Valkenburg identified Tandem Defense as "our new drone company" and described the Matrix Drone that had been sold by Strategic Logix as Tandem Defense's "flagship product."

xv. A. Valkenburg used Strategic Logix customer lists, sales information, and intellectual property for the purpose of competing with Strategic Logix.

xvi. Upon information and belief, A. Valkenburg has appropriated, in violation of his duties to Strategic Logix, business opportunities of the company.

e. Failing to act with the utmost good faith and fairly treat Orsburn by paying excessive compensation and wasting company resources through unjustified, self-serving compensation and bonuses; and

f. Failing to act with the utmost good faith and fairly treat Orsburn in allowing the transfer of substantially all assets of Strategic Logix to Tandem.

i. As described in detail above, Schnipke and N. Valkenburg allowed A. Valkenburg to take almost everything Strategic Logix had of value to Tandem Defense. Then Schnipke joined A. Valkenburg at the new competitor, completing the migration of Strategic Logix's business, operations, and leadership to Tandem Defense.

ii. Thus, Schnipke, N. Valkenburg and A. Valkenburg were successful in their bad-faith plan to cut Orsburn out of the business.

296. In addition, each of the breaches of duties identified above also constitute breaches of the duty of loyalty owed to Orsburn by Schnipke, A. Valkenburg and N. Valkenburg because in each of the actions and omissions set forth above, Schnipke, A. Valkenburg and N. Valkenburg prioritized their own interests (and also in the case of N. Valkenburg the financial interest of his brother) over the best interests of Orsburn, their fellow member in Strategic Logix.

297. Schnipke, A. Valkenburg and N. Valkenburg breached their duty of loyalty by:

a. failing to pursue and/or consummate potential sales or investments on behalf of Strategic Logix;

b. taking actions to squeeze Orsburn out of his ownership interest in Strategic Logix on the eve of a potential sale of the company;

c. facilitating the migration of information, assets and intellectual property from Strategic Logix to Tandem Defense.

d. engaging in and permitting direct competition with Strategic Logix; and

e. engaging in non-arm's length, unfair and self-dealing transactions aimed at squeezing Orsburn out of his interest in Strategic Logix.

298. A. Valkenburg and J. Schnipke stand to further personally profit from the foregoing tortious conduct through an upcoming deSPAC transaction involving Tandem Defense's parent company, Powerus.

299. N. Valkenburg purported to give back his equity in Strategic Logix for no immediate payment but the promise of future consideration from Schnipke and/or A. Valkenburg.

300. Schnipke and N. Valkenburg also breached their duty of loyalty by engaging in conflicting interest transactions.

a. In aid of A. Valkenburg's efforts to establish Tandem Defense, Schnipke and N. Valkenburg caused Strategic Logix to engage in the following transactions which purported to do the following:

i. authorize A. Valkenburg to cease his responsibilities as an officer (COO) of Strategic Logix and immediately retain A. Valkenburg as an "independent contractor," which allowed A. Valkenburg to have continued access to Strategic Logix's information system and operations for a period of time when he was actively competing with Strategic Logix; and

ii. grant A. Valkenburg a royalty-free, perpetual license to use all Strategic Logix intellectual property. This license would continue even after A. Valkenburg left Strategic Logix.

b. The foregoing constitute conflicting interest transactions which were neither taken in compliance with O.C.G.A. § 14-11-307, nor were they fair to Orsburn as a minority member. Each of the members other than Orsburn had either a conflicting interest respecting the transaction or a familial, financial or employment relationship with a second member who has a conflicting interest respecting the transaction, which relationship would, in the circumstances, reasonably be expected to exert an influence on the member's judgment when voting on the transaction.

c. As described in detail, herein, A. Valkenburg raided the information and intellectual property of Strategic Logix to establish a competing venture, Tandem Defense, for his personal profit at the expense of Orsburn. Thus A. Valkenburg, in addition to being a party to the transactions noted above, had a beneficial financial interest in the transaction that was of such financial significance as to influence his judgement.

d. N. Valkenburg is A. Valkenburg's brother, and, therefore, not a qualified member under O.C.G.A. § 14-11-307(g).

e. Schnipke had a conflicting interest, himself, stemming from his desire to seize a portion of Orsburn's interest for himself, which he now has done by joining Tandem Defense as its COO. Further, even in the absence of his own conflicting interest, Schnipke is not a qualified member under

O.C.G.A. § 14-11-307(g) because of his long-term professional and employment relationship with A. Valkenburg.

***Causation and Damages***

301. Orsburn suffered damages proximately caused by the foregoing breaches of fiduciary duties.

302. The injuries suffered by Orsburn as a result of the foregoing breaches of fiduciary duties are separate and distinct from those suffered by other members of Strategic Logix.

303. Orsburn is entitled to special and general damages in amounts to be proved at trial.

304. The damages proximately caused to Plaintiff Orsburn by the breaches of fiduciary duties by Schnipke, A. Valkenburg and N. Valkenburg include but are not limited to the loss of Orsburn's full value of his membership in Strategic Logix, the loss of a fair value buyout of his membership in Strategic Logix, the loss of the value of his employment at Strategic Logix, the loss of the value Orsburn would have received from Powerus's acquisition of Tandem Defense, the loss of value of equity and/or options in Powerus, the loss of value of employment with Tandem Defense and Powerus, and the loss of value of his career in the rapidly growing drone industry.

305. Orsburn continues to suffer damages as a result of the foregoing breaches of fiduciary duties.

306. Schnipke, A. Valkenburg and N. Valkenburg acted in concert, were joint tortfeasors, their fault is indivisible, and, therefore all of these Defendants are jointly and severally liable for the full amount of Orsburn's damage.

307. Orsburn is entitled to recover punitive damages because the actions of Schnipke, A. Valkenburg and N. Valkenburg show willful misconduct, malice, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences.

308. Schnipke, A. Valkenburg and N. Valkenburg acted, or failed to act, with the specific intent to harm. They caused willful and malicious injury to Orsburn and their wrongful conduct was intended to cause deliberate and intentional injury.

**COUNT IV**
**Aiding and Abetting**
**Against Andrew Valkenburg, Neil Valkenburg,**
**Tandem Defense, and Powerus**

309. Orsburn incorporates by reference Paragraph Nos. 1 to 235 and 274 to 308 of his Amended Complaint.

310. Defendants Andrew Valkenburg, Neil Valkenburg, Tandem Defense, and Powerus (the "Aiding and Abetting Defendants") knew that Schnipke and A. Valkenburg were each member managers of Strategic Logix, thus owing it and

Orsburn fiduciary duties to act in good faith in the best interests of Strategic Logix and with the requisite care.

311. The Aiding and Abetting Defendants knew that Schnipke, A. Valkenburg, and N. Valkenburg were executives or officers of Strategic Logix, thus owing it and Orsburn fiduciary duties to act in good faith in the best interests of Strategic Logix and with the requisite care.

312. Through improper action or wrongful conduct, without privilege and with malice, the Aiding and Abetting Defendants acted to procure—whether by procuring, assisting, furthering, persuading, or otherwise—breaches of Schnipke's and Valkenburg's fiduciary duties, as exemplified below.

313. A. Valkenburg took wrongful action, with malice, without privilege, and procured Jeremy Schnipke to demand that Orsburn give up his equity at Strategic Logix for pennies on the dollar; condition Orsburn's post-deployment employment at Strategic Logix on giving up his equity; render Strategic Logix an empty shell and wind it down; cease Strategic Logix's business and transfer it to Tandem Defense; and run companies—Tandem Defense and Powerus—to continue Strategic Logix's business and compete with it.

314. Through the actions described in this Amended Complaint, N. Valkenburg took wrongful action, with malice, without privilege, and procured Schnipke's and Andrew Valkenburg's scheme to render Strategic Logix an empty

shell; cease Strategic Logix's business; and create and run Tandem Defense and Powerus to continue Strategic Logix's business and compete with it.

315. Through the actions described in this Amended Complaint, Tandem Defense took wrongful action, with malice, without privilege, and procured Andrew Valkenburg's and Jeremey Schnipke's breaches of fiduciary duties, including by providing A. Valkenburg a platform to take Strategic Logix's business and compete with it by diverting employees, customers, suppliers, and business contacts.

316. On information and belief, Tandem Defense took wrongful action, with malice, without privilege, and procured Schnipke to cease Strategic Logix's business and transfer it to Tandem Defense, then run Tandem Defense to continue Strategic Logix's business and compete. On information and belief, Tandem Defense persuaded Schnipke to cease Strategic Logix's business and transfer it to Tandem Defense with the understanding that Schnipke would thereafter receive employment, an officer role, and/or equity with Tandem Defense to continue Strategic Logix's drone business there. In or about March 2026, Schnipke joined Tandem Defense as its Chief Operating Officer, while around that same time ceasing his work as Strategic Logix's Chief Executive Officer despite claiming to be Strategic Logix's managing member.

317. Powerus took wrongful action, with malice, without privilege, and procured Andrew Valkenburg and Jeremy Schnipke to breach their fiduciary duties to Strategic Logix and Orsburn.

318. Upon information and belief, Powerus and its agents took wrongful action, with malice, without privilege, and procured Valkenburg and Schnipke to demand that Orsburn give up his equity in Strategic Logix for pennies on the dollar and demand that Orsburn give up his equity for employment at Strategic Logix. Shortly before these demands, A. Valkenburg received an offer to purchase Strategic Logix for tens of millions of dollars. And shortly after Orsburn declined these demands, A. Valkenburg indicated to third parties that Strategic Logix was rebranding, changing its name, dissolving, and/or restructuring as part of multiple companies. On information and belief, Powerus and its agents procured Valkenburg and Schnipke to make these demands and pursue this scheme in connection with Powerus acquiring Strategic Logix and/or its business, customers, drones, and employees.

319. Powerus took wrongful action, with malice, without privilege, and procured A. Valkenburg's scheme to found and run Tandem Defense and Powerus as vehicles to appropriate Strategic Logix's drone business, customers, employees, and value as their own, without Orsburn, his equity, or his employment

320. Both Powerus and Tandem Defense tout themselves as drone companies selling the Matrix drone series, which is based on and uses Strategic Logix's RRSL drone, its awards, and its specifications.

321. Powerus also took wrongful action, with malice, without privilege, and procured Valkenburg's and Schnipke's transfer of Strategic Logix's business and value from Tandem Defense to Powerus, with the contemporaneous killing of Strategic Logix's business. While knowing that Tandem Defense was founded for the purpose of appropriating Strategic Logix's business, customers, employees, and value, Powerus offered and provided A. Valkenburg cash, employment, and equity to transfer that to Tandem Defense and Powerus. And with that same knowledge, Powerus later offered and gave Schnipke employment and equity in consideration for his killing of Strategic Logix's business, ceasing work as Strategic Logix's CEO, and instead working for Tandem Defense and Powerus to continue and enhance the value of Strategic Logix's former business without Addam Orsburn.

322. In March 2026, Powerus founder and Tandem Defense executive A. Valkenburg communicated that he was helping Schnipke to wind down Strategic Logix.

323. The Aiding and Abetting Defendants acted wrongfully and without privilege with knowledge that Schnipke and/or A. Valkenburg owed Strategic Logix and Orsburn fiduciary duties.

324. The Aiding and Abetting Defendants acted purposely, with malice, and with intent to injure.

325. The Aiding and Abetting Defendants conduct did proximately cause damage to Plaintiff Orsburn, including special injury to him. The damages proximately caused to Plaintiff Orsburn by the Aiding and Abetting Defendants include the loss of the full value of his membership in Strategic Logix, the loss of a fair value buyout of his membership in Strategic Logix, the loss of the value of his employment at Strategic Logix, the loss of the value from Powerus's acquisition of Tandem Defense, the loss of value of equity and/or options in Powerus, the loss of value of employment with Tandem Defense and Powerus, and the loss of value of his career in the rapidly growing drone industry. Plaintiff continues to suffer damage proximately caused by the conduct of the Aiding and Abetting Defendants.

326. The Aiding and Abetting Defendants acted in concert, were joint tortfeasors, their fault is indivisible, and all Defendants are jointly and severally liable for the full amount of Orsburn's damage.

327. Orsburn is entitled to recover punitive damages because the Aiding and Abetting Defendants' actions show willful misconduct, malice, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences.

328. The Aiding and Abetting Defendants acted, or failed to act, with the specific intent to harm. The Aiding and Abetting Defendants caused willful and malicious injury to Orsburn and their wrongful conduct was intended to cause deliberate and intentional injury.

**COUNT V**
**Civil Conspiracy**
**Against All Defendants**

329. Orsburn incorporates by reference the allegations contained in paragraphs 1 to 235, 274 to 308, and 310-328 of his Amended Complaint.

330. Schnipke, A. Valkenburg, and N. Valkenburg combined in a common design with a mutual understanding to require that Orsburn give up his equity at Strategic Logix for pennies on the dollar, far below its fair value. Likewise, Schnipke and A. Valkenburg combined in a common design with a mutual understanding to condition Orsburn's post-deployment employment at Strategic Logix on giving up his equity.

331. N. Valkenburg joined in this scheme and assisted it by purporting to give up his Strategic Logix equity for no immediate payment but promise of future payment to pressure Orsburn to give up his equity and to assist Schnipke and Andrew Valkenburg in forcing Orsburn to do so. N. Valkenburg joined this scheme and assisted it while knowing of its existence of this scheme and purposes.

332. Schnipke, A. Valkenburg, and N. Valkenburg combined in this scheme with the knowledge that Orsburn was deployed to a hostile-fire zone serving our nation, that his equity was worth many millions more than their demands, that they were obligated to pay Orsburn fair value to buy out his equity, and that Strategic Logix was obligated to employ Orsburn after returning from deployment.

333. Powerus and Tandem Defense combined with A. Valkenburg and/or Schnipke in a common design and a mutual understanding to extract Orsburn's equity from Strategic Logix without paying fair value for it.

334. When Orsburn refused to accede to these demands, Defendants continued their conduct with a common design and a mutual understanding to otherwise destroy and appropriate the value of Orsburn's equity and employment at Strategic Logix to themselves and others in another company or companies.

335. Among other things, Schnipke and A. Valkenburg had Schnipke's and Strategic Logix's counsel communicate to Orsburn's counsel around October 2025 that Orsburn was not a member of Strategic Logix and that if he did not agree, then Strategic Logix's members would dissolve Strategic Logix and start a new company.

336. Orsburn refused these unlawful demands and did not agree he was not a member of Strategic Logix.

337. Around that time or thereafter, all Defendants combined in a common design with a mutual understanding to:

a. destroy, eliminate, reduce, dissolve, or render as an empty shell Strategic Logix, its business, and its opportunities to appropriate the value of Orsburn's equity and employment in Strategic Logix to themselves;

b. transfer Strategic Logix's business, customers, opportunities, and employees to a new company or companies, Tandem Defense and Powerus, to appropriate the value of Orsburn's equity and employment in Strategic Logix to themselves; and

c. continue and grow Strategic Logix's business, customers, opportunities, and employees at Tandem Defense and Powerus to appropriate the value of Orsburn's equity and employment in Strategic Logix to themselves.

338. Whether at inception or later, Defendant N. Valkenburg knew of the conspiracy and joined therein with knowledge of its existence and purposes. For instance, he purported to give up his Strategic Logix equity to Schnipke and A. Valkenburg for no immediate payment to assist in forcing Orsburn to do so. And later, N. Valkenburg assisted Schnipke and A. Valkenburg for the purpose of purporting to free A. Valkenburg and Tandem Defense to take Strategic Logix's business, customers, and employees to a new company; permitting A. Valkenburg to continue working for Strategic Logix in 2026 to assist in building Tandem Defense

and selling it to Powerus; and to assist Tandem Defense and Powerus in continuing and growing Strategic Logix's business without Orsburn or his equity.

339. Whether at inception or later, Tandem Defense knew of the conspiracy and joined therein with knowledge of its existence and purposes. For instance, Tandem Defense assisted Andrew Valkenburg and Schnipke in using Strategic Logix's brand, drones, awards, specifications, customers, and employees at Tandem Defense to appropriate for themselves and Powerus the value of Orsburn's equity and employment. Likewise, Tandem Defense CEO Valkenburg worked with Schnipke to wind down Strategic Logix's drone business.

340. Whether at its inception of later, Defendant Powerus knew of the conspiracy and joined therein with knowledge of its existence and purposes. For instance, Powerus assisted A. Valkenburg and Schnipke in using Strategic Logix's brand, drones, awards, specifications, customers, and employees at Tandem Defense and Powerus to appropriate for themselves the value of Orsburn's equity and employment. Likewise, Powerus founder and executive A. Valkenburg worked with Schnipke to wind down Strategic Logix's drone business.

341. After Plaintiff filed this lawsuit, Powerus, Tandem Defense, A. Valkenburg, and Schnipke acted further with a common design and a mutual understanding to appropriate for themselves Orsburn's equity and employment with Strategic Logix by transferring Tandem Defense's drone business—derived from

Strategic Logix as described herein—as well as the Tandem Defense's operations, customers, and employees to Powerus.

342. Orsburn filed this lawsuit on March 26, 2026 and served it on Defendants before April 2026. In April 2026 and thereafter, Powerus, Tandem Defense, A. Valkenburg, and Schnipke transferred Tandem Defense's business—for instance its Matrix drones based on and continuing Strategic Logix's RRSL drones, PBAS award, specifications, etc.—to Powerus. Likewise, these Defendants transferred A. Valkenburg's, Schnipke's, and other former Strategic Logix-related roles to Powerus to continue Strategic Logix's business outside of Defendant Tandem Defense and with a then non-Defendant in this lawsuit to evade tort liability. And in effort to continue this scheme and cover it up, Powerus and Tandem Defense had its officers backdate their roles and claim different roles to hide the conspiracy to appropriate Orsburn's equity and employment in Strategic Logix to Powerus, Tandem Defense, Andrew Valkenburg, Neil Valkenburg, and Schnipke.

343. As alleged herein, each Defendant combined with all or some of the other Defendants to either breach their respective fiduciary duties or aid and abet such breach of fiduciary duties, which was and is unlawful, oppressive, and immoral. Likewise or alternatively, as alleged herein, each Defendant combined with all or some of the other Defendants to do some purportedly lawful act by means or methods that were and are unlawful, oppressive, or immoral.

344. Orsburn suffered injury, harm, and damages by virtue of the conspiracy or conspiracies alleged herein and the torts committed by Defendants via their breaches of fiduciary duties and aiding and abetting of such.

345. Defendants acted in concert, were joint tortfeasors, their fault is indivisible, and all Defendants are jointly and severally liable for the full amount of Plaintiff's damage.

346. Orsburn is entitled to recover punitive damages because Defendants' actions show willful misconduct, malice, wantonness, oppression, or that entire want of care which would raise the presumption of conscious indifference to consequences.

347. Defendants acted, or failed to act, with the specific intent to harm. Defendants caused willful and malicious injury to Orsburn and their wrongful conduct was intended to cause deliberate and intentional injury.

## COUNT VI
## O.C.G.A. § 13-6-11
## Against All Defendants

348. Orsburn incorporates by reference the allegations contained in paragraphs 1 through 225, 274-308, 310-28, and 330-47 of his Amended Complaint.

349. Defendants have acted in bad faith, have been stubbornly litigious, and have caused Plaintiff unnecessary trouble and expense.

350. Accordingly, Orsburn hereby specially pleads and prays that the jury award him his attorneys' fees and expenses of litigation pursuant to O.C.G.A. § 13-6-11.

**WHEREFORE,** Orsburn respectfully requests that the Court award the following relief:

a. Award Orsburn preliminary and permanent injunctive relief, including reinstatement, equity or equity proceeds transfer, a declaration that Tandem Defense is a successor in interest to Strategic Logix, and a declaration that Defendants violated USERRA;

b. Enter a declaratory judgment declaring that Tandem Defense and Powerus are successors in interest to Strategic Logix;

c. Enter a declaratory judgment declaring that Powerus is an alter ego of Tandem Defense;

d. Award Orsburn full back pay, including all lost pay and benefits, raises, cost of living increases, retirement benefits, equity, and all other lost benefits and compensation reducible to a dollar amount;

e. Award Orsburn front pay, including all lost future pay and benefits, raises, cost of living increases, retirement benefits, and all other lost benefits and compensation reducible to a dollar amount;

f. Award Orsburn prejudgment interest as required by law;

g. Award Orsburn 20% of Tandem Defense's equity, 20% of the proceeds from any transaction to acquire Tandem Defense's equity, and/or the consideration received for Tandem Defense;

h. Award Orsburn liquidated damages against Defendants sufficient to punish it for its unlawful conduct and deter it from repeating such conduct in the future;

i. Award Orsburn compensatory damages;

j. Award Orsburn punitive damages;

k. Award Orsburn his reasonable attorneys' fees and expenses; and

l. Grant such additional relief as may be just.

**JURY DEMAND**

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Orsburn demands a jury trial on all issues so triable.

[*signature block on following page*]

Respectfully submitted, this 15th day of July, 2026.

*<u>/s/ Patrick C. Fagan</u>*
David G. H. Brackett
Georgia Bar No. 068353
Patrick C. Fagan
Georgia Bar No. 387016
BONDURANT MIXSON
& ELMORE, LLP
3900 One Atlantic Center
1201 West Peachtree Street, N.W.
Atlanta, Georgia 30309
Telephone: (404) 881-4100
Facsimile: (404) 881-4111
brackett@bmelaw.com
fagan@bmelaw.com

*<u>/s/ Alexander C. Meier</u>*
Alexander C. Meier
Georgia Bar No. 282350
Cary R. Burke
Georgia Bar No. 757627
LEE MEIER BURKE, LLC
695 Pylant Street NE, Suite 105
Atlanta, Georgia 30306
Telephone: (404) 999-4798
ameier@leemeierburke.com
cburke@leemeierburke.com

**COUNSEL FOR PLAINTIFF**

**CERTIFICATE OF COMPLIANCE WITH LOCAL RULE 7.1D**

Pursuant to L.R. 7.1D (N.D. Ga.), the undersigned certifies through undersigned counsel that this filing has been prepared in Times New Roman, size 14-point font, which is one of the fonts approved by L.R. 5.1C (N.D. Ga.).

*s/ Alex Meier*
*Counsel for Plaintiff*

**CERTIFICATE OF SERVICE**

I hereby certify that on this 15th day of July, 2026, I filed the foregoing document with the Clerk of Court using the CM/ECF system, which will provide notice to Defendants' counsel as follows:

*Counsel for Defendant Andrew Valkenburg*
Cary King
SK Legal Group, LLC
cary@sklawgroupatl.com

*Counsel for Defendant Jeremy Schnipke*
Grace M. Tillman
Oberman Law Firm
grace@obermanlaw.com
Kimberly Worth
kworth@worthjarrell.com

*Counsel for Defendant Tandem Defense, LLC*
Peter J. Wozniak
Andrew Cockroft
King & Spalding LLP
pwozniak@kslaw.com
acockroft@kslaw.com

*s/ Alex Meier*
*Counsel for Plaintiff*